PUMPHREY ET AL., APPELLANTS, *v.* QUILLEN ET AL., APPELLEES;
ET AL.*

(No. 4539—Decided June 1, 1955.)

*Messrs. Smoyer & Smoyer* and *Mr. Ben H. Baldwin,* for appellants.

*Messrs. Johnstone & Gabalac,* for appellees Neal T. Quillen and Kittie E. Quillen.

*Messrs. Felver & Hartnett,* for appellee Bethel W. Taylor.

DOYLE, J.  This was an action in tort for deceit, brought by Charles E. and Dora B. Pumphrey, husband and wife, as purchasers of a house and lot from Neal T. and Kittie E. Quillen, also husband and wife, through the alleged agency of Hudson J. Force and Bethel W. Taylor, realtors.

It was claimed in the petition that the Quillens, owners of the premises, employed one, Force, to obtain a purchaser for this property, and that "thereafter said Force, by virtue of

*Judgment affirmed, 165 Ohio St., 343.

some arrangement the exact nature of which is unknown to the plaintiffs, employed the defendant Taylor to aid and assist him in procuring the purchasers of the said premises, all of which was done with the knowledge and consent of the defendants Quillen.'' (The arrangement mentioned here is explained in the evidence as a so-called multiple listing.)

The petition continued by pleading that Taylor sought to interest the plaintiffs in the purchase of the premises; that plaintiffs later examined and inspected the property, ''and that then and thereafter the defendants (the owners and the two realtors) represented to the plaintiffs that the outside walls of said house were of tile construction with an outer veneer coating of Perma-Stone and with plaster on the inside of said walls''; that because of the Perma-Stone covering on the outer walls and plaster on the inner walls, it was impossible for plaintiffs to see and learn the composition of the walls; and that in fact all of the outside walls had been made and constructed in the following manner:

''Wooden forms had been constructed with an opening about one foot in width and through such opening earth and clay had been poured into said forms and as a binding agent straw had been mixed therewith and after said material had been tamped the forms were removed and an outer coating, first of some tar-like preparation on the outside of the walls, and plaster on the inside, served to completely conceal the fact that said walls were constructed of earth, clay and straw as aforesaid; and that thereafter, and before the events herein complained of, a thin veneer of Perma-Stone had been placed along the outside of the walls; and that all of said facts concerning said building and the composition of said walls were well known to each of the defendants at all of the times herein complained of.''

The plaintiffs further averred that they relied on the representations made to them by the ''defendants,'' which they assert were made ''for the purpose of inducing them to purchase said premises, and that, as a direct result thereof * * *, they entered into a written contract with the defendants Quillen, by the terms of which they agreed to purchase said premises for the sum of * * * $10,250, and that thereafter they paid

to the defendants Quillen the sum of * * * $4,000 in cash and also the sum of * * * $5,500, which, at the instance of said Quillens, they obtained on a first mortgage loan from a bank, and to complete the balance of said purchase price they gave to the defendants Quillen a promissory note in the amount of * * * $166 and a second mortgage and note for * * * $500, and that thereupon the defendants Neal T. Quillen and Kittie E. Quillen executed and delivered to them their warranty deed for the premises * * *.''

The petition continued by alleging that the defendants ''conspired'' to defraud the plaintiffs; that plaintiffs would not have purchased the property if it had not been misrepresented; and that they were substantially damaged because of the deceit.

The pleading concluded with a prayer for judgment in the sum of $9,500 by way of compensation, and, in addition thereto, punitive damages for attorney fees and expenses.

Issues were joined by the answers of the several defendants.

Upon trial, the jury returned a verdict in favor of the plaintiffs and against the defendants the Quillens and Taylor in the sum of $8,350. Judgment was thereupon entered in the amount of the verdict. (Judgment was rendered in favor of Force at the conclusion of the plaintiff's case in chief.)

Pursuant to the entering of motions for judgment *non obstante veredicto* and to motions for a new trial, by the several defendants, the court ordered ''that said motions for judgment notwithstanding the verdict be sustained and are sustained hereby, and the verdict of the jury is set aside and the judgment entered thereon is vacated and held for naught, and final judgment for the defendants is entered hereby. * * * It is also the finding of the court that said motions for a new trial should be sustained, and * * * it is therefore ordered, adjudged and decreed that defendants shall have a new trial in the within action in the event that the appellate courts reverse the judgment notwithstanding the verdict previously entered herein, all pursuant to O. R. C. 2323.18, 2323.181 and 2321.17. * * *''

The plaintiffs have appealed to this court on questions of law. No appeal has been taken from the order in favor of Force.

The evidence justifies the conclusions that the house was

built by one Rogers, in 1939, and was of "rammed earth" construction. In 1952, the Quillens purchased the property from one Mack without any knowledge of the materials used in the construction of the walls. They thought, however, so they said, that the walls were made out of some kind of masonry. They had acquired the property in a trade and had never occupied it.

On or about July, 1952, Quillen telephoned Hudson J. Force, a realtor, and gave him an oral listing for the sale of the property for the sum of $10,500. He told Force that the house was a Perma-Stone bungalow. (Mack, the previous owner, had covered the walls with Perma-Stone in 1950.) Following this listing with Force, the realtor, Taylor, became a participant in the sales transaction through what is termed a "multiple listing" arrangement. This arrangement resulted from rules adopted by an association of men who belonged to the Akron Real Estate Board. Under the rules, the members worked together on prospective real estate deals, whereby a member would report to the group a listing, and, if some other member received a purchaser for the property, the realtors split the commission, after payment of a small sum to the group organization for expenses.

In the instant case, Force, who had the property listed, worked with Taylor, who had a prospective purchaser, to effect the ultimate sale under the circumstances hereinafter related. The two realtors, Force and Taylor, viewed the property together. Later, on this same day, Taylor showed the property to the Pumphreys, who had engaged him to look for a property for them; and, on the evening of that day, the Pumphreys signed a purchase offer at Taylor's office, in which the home was identified as a "Perma-Stone bungalow." Thereupon Taylor gave the document to Force, who presented it to Quillen, who signed it as owner. Quillen learned of the Pumphrey and the Taylor connection for the first time when the sales agreement was presented to him for his signature by Force.

There is no evidence indicating that the Quillens, nor, indeed, Force, knew of any representations made by Taylor to the Pumphreys, relative to the materials used in construction. They did, however, sign the contract with knowledge of Taylor's connection with the sale to the Pumphreys.

The evidence further warrants the conclusion that Taylor, in reply to questions asked by the Pumphreys, before the sale, said to them that the walls were constructed of tile; and that, in the absence of such representation, they (the Pumphreys) would not have purchased the property.

The evidence further warrants the conclusion that the Quillens, as stated before, knew, before they signed the contract, that Taylor had sold the property to the Pumphreys; there is no evidence, however, that the Quillens knew of the kind of material used in the construction of the house, nor that Taylor had represented it as being of tile construction, nor had even known that Taylor had any connection with its sale until after the alleged misrepresentation. The representation, in this respect, made to Force, was that the house was "stucco on Perma-Stone."

1. The question of conspiracy. In this state conspiracy, in and of itself, furnishes no basis for civil action. A cause of action may arise when damage results from acts committed pursuant to a formed conspiracy.

"If persons conspire together to do an unlawful act, or to do a lawful act by unlawful means, then one knowing the purpose thereof, who enters into such a conspiracy, is bound by the things said and done by any of their number in carrying out the purpose of such conspiracy, so long as he remains in the conspiracy and does not withdraw therefrom."

10 Ohio Jurisprudence (2d), Conspiracy, Section 4, and cases there cited.

In the case before us there is charged a conspiracy to defraud. The words "conspiracy to defraud" import moral obliquity. According to their natural meaning they signify an attempt to deceive by fraud. Such conduct may not be presumed, nor may it be established by surmise or conjecture. It must be proved by direct evidence or by justifiable inferences from established facts and circumstances. All of those who actively participate, by co-operation or request, in a tortious act to defraud which results in damage, or who lend aid to the wrongdoers, or ratify or adopt the acts done for their benefit, are equally liable with him. Express agreement is not necessary, and all that is required is that there should be a common

design or understanding, even though it be a tacit one. Prosser on Torts (Hornbook Series), Section 109, at p. 1094, and cases cited.

This court, in the case of *Houston* v. *Avery*, 19 Ohio Law Abs., 142, at p. 147, stated:

''In order to show such a conspiracy (to defraud), the rule recognized by courts generally is that it is not necessary to prove an express agreement among the parties, or that the parties met at any time and entered into any explicit or formal agreement, either written or oral, and that it is sufficient that the parties in any manner come to a mutual understanding that they will accomplish the unlawful design; that the essential element of the charge of conspiracy (to defraud) is the common design, and that an affirmative fraudulent representation need not be shown, but that a concealment of the true nature of the transaction is sufficient to show fraud.''

Looking now to the record, what sinister conduct of the defendants Quillen (the sellers of the property) can be found? The Quillens owned the property but had never lived in it. They were entirely ignorant of the materials used in its construction. They told realtor Force to sell it for them and told him that it was ''a Perma-Stone bungalow.'' This statement was true.

Taylor, another realtor, was engaged by the Pumphreys, the purchasers, to find them a property. Force and Taylor, through a ''multiple listing'' arrangement, heretofore explained, viewed the property, and later Taylor persuaded his clients, the Pumphreys, to purchase the property. They signed an instrument of purchase at Taylor's behest, which later was conveyed to Force, who secured the signatures of his clients, the Quillens.

At no time during these negotiations did the Quillens know of Taylor's connection with the deal, and obviously were in complete ignorance of any representations made by Taylor to his clients, the Pumphreys. The Quillens did not know of Taylor's connection with the sale until their own agent, Force, brought to them the agreement of purchase theretofore signed by the Pumphreys at Taylor's office.

This court finds no evidence in this record indicating a com-

mon design among the defendants to defraud the plaintiffs, and on this point we are of the opinion that reasonable minds can come to no other conclusion.

2. Over and beyond the question of conspiracy, do the pleadings and the evidence permit a judgment against the Quillens, the sellers?

If Taylor was not an agent of the Quillens, they could not be held liable for misrepresentations made by him. The operative facts bearing on this question of agency may be summarized as follows:

Taylor showed the house, which was empty, with the permission of Force, to his (Taylor's) clients by virtue of the multiple listing arrangement. The Quillens had not authorized Taylor to represent them, nor had they authorized their agent, Force, to employ him or anyone else to sell their house. Taylor was not associated in business with Force, except only as a fellow member of the "multiple listing group," of which the Quillens knew nothing. The Quillens paid the entire commission to Force and nothing to Taylor. Force did, however, split the commission with Taylor.

The Quillens learned for the first time of Taylor's connection with the deal when they saw his name on the contract form which they were asked to sign by Force, after Taylor had secured the signatures of his clients, the Pumphreys. When the Quillens signed the contract, they had no knowledge of any representations made by Taylor in connection with the sale, and only heard of this claim after the deal had been closed, the deed given, and the financing completed.

While it might be of academic interest to here discuss and decide whether Taylor ever actually became the agent of the Quillens, we are of the opinion that a decision on that point is unnecessary. Under no theory of agency, in the light of the facts shown to exist, can the Quillens be held liable for the claimed misrepresentations of Taylor. At the time of the claimed misrepresentations, Taylor was not the agent of the Quillens. Nothing of jural consequence had occurred even tending to establish such a relationship at the time. The practice adopted by real estate brokers and salesmen for so-called "multiple listing" arrangements does not bind persons who

employ agents, in the absence of knowledge, to any legal consequences arising therefrom.

Owners of property are not liable for a broker's or salesman's misrepresentations in which the owners did not participate before the commencement of an agency; and, in an action in tort by a purchaser against an owner for damages for misrepresentations which induced the sale, such owner is not liable, where the evidence establishes that the realtor was not the owner's agent at the time of the misrepresentations, and only became a participant in the sale under a nondisclosed arrangement with the owner's agent—in which sale said realtor interested his own principal in buying the property. See: *Boss* v. *Tomaras,* 251 Mich., 469, 232 N. W., 229; *Polly* v. *Charouhis,* 253 Mich., 363, 235 N. W., 184; *Smith* v. *Highland Park State Bank,* 309 Mich., 226, 15 N. W. (2d), 142; *Webb* v. *Johnston,* 246 Mass., 229, 140 N. E., 814.

We conclude that no judgment can properly stand against the Quillens.

3. Is there evidence of fraud and deceit on the part of Taylor which can subject him to damages for tort?

Actions of this type are generally brought where a defendant's misrepresentation of fact has misled the plaintiff into some venture which concerns his commercial, financial or economic advantage. In such cases, the plaintiff's loss consists in not receiving the financial benefit which would accrue to him had the statement been true.

While the law in this state, governing actions in deceit, is by no means clearly settled, yet, there may be found, in the Supreme Court decisions, a tendency to treat the necessary element of intent, or, in other language, scienter, as an intent to deceive, to mislead, to convey a false impression. Obviously, this must be a matter of belief or of absence of belief that the representation is true. The state of the speaker's mind must be inquired into in determining whether an action of deceit can be maintained. The required intent is indeed present in cases where the speaker believed his statement to be false, as also in cases where the representation is made without any belief whatsoever of its truth or falsity.

Most courts in this country have gone further and held that, where representations are made by a person who is con-

scious that he has no sufficient basis of information to justify them, he may be culpably liable in an action in deceit. When one asserts a fact as of his own knowledge, or so positively as to imply that he has knowledge, when he knows that he has not sufficient information to justify it, he may be found to have the intent to deceive.

In the case of *Taylor* v. *Leith,* 26 Ohio St., 428, appears the following (at p. 434):

"The present action is brought to recover damages for fraud or deceit practiced in the sale of land. To constitute a cause of action there must be bad faith. If the representations, when made, were believed to be true, and the facts of the case were such as to justify the belief, there then is no fraud or deceit, and there can be no recovery."

*Quaere*: Did the Supreme Court mean that, even though the speaker believed his statements true, if his knowledge of the facts was not sufficient to justify such a belief, he may be liable for deceit?

In the case of *Aetna Ins. Co.* v. *Reed,* 33 Ohio St., 283, the court adopted (at p. 294) the language of Bigelow on Fraud, 61. It is:

"If the party made the representation not knowing whether it was true or false, he can not be considered as innocent; since a positive assertion of a fact is, by plain implication, an assertion of knowledge concerning the fact. Hence, if a party have no knowledge, he has asserted for true what he knew to be false."

In *Gleason* v. *Bell,* 91 Ohio St., 268, 110 N. E., 513, the first paragraph of the syllabus is:

"1. Where a purchaser was induced to buy and pay for a city residence, by false representations made to him by the vendor as positive statements of fact clearly implying knowledge of the owner of the truth of the facts stated, and made under such circumstances that the vendor should have known of the falsity of the representations, and they were of such a nature as to affect the character, utility and value of said property, and the purchaser had a right to and did rely thereon, and suffered damage by reason thereof, he may recover. In such a case an averment that the vendor knew the representations to be false and made them with intent to deceive is not essential."

See also: Drew v. Christopher Construction Co., Inc., 140 Ohio St., 1, 41 N. E. (2d), 1018.

In consideration of the case law in this state, we are of the opinion that we do no violence to the majority of the cases if we adopt for this case the pronouncement of Professor Francis H. Bohlen, in 42 Harvard Law Review, 733, at p. 738. It is:

"One who states that a fact exists which he knows does not exist, or who misstates his own state of mind in regard thereto, as by saying that he knows its existence when he is conscious that he merely believes it to exist, does intentionally mislead him to whom the information is given. He may not intend to mislead the other to his harm; indeed, he may hope that the future will make true that which he knows to be at the time a misstatement, or he may mislead the other for what he himself believes to be the other's good. But, even so, he does intend to mislead. If, however, he honestly believes that not only the facts but his conviction as to their existence are exactly what his statement represents them to be, he can have no intention to mislead. * * *"

It will be noted that we have not used the word "negligence" in any of our statements. Some courts recognize a liability for negligent misrepresentation. We are treating deceit as a rule of law based upon a state of mind. Negligence is not a state of mind. Negligence does not involve necessarily scienter, as does deceit.

We are of the opinion that the evidence is sufficient for the submission to a jury of the question of fraudulent misrepresentation amounting to deceit on the part of Taylor. Taylor's inspection of the premises and his knowledge of the house from other sources was indeed meager. A jury might properly find that Taylor, at the time he represented the house to be of tile construction, was conscious of the fact that he did not have sufficient basis of information to justify the statement.

The judgment non obstante veredicto is affirmed, in so far as it relates to the Quillens. In so far as it relates to Taylor, it is reversed, and the cause as to him is remanded to the trial court for further proceedings.

*Judgment affirmed in part and reversed in part.*

STEVENS, P. J., and HUNSICKER, J., concur.