**Lena WILLIAMS, et al., Plaintiffs,**

v.

**AMF INCORPORATED, et al., Defendants.**

No. C–3–79–227.

United States District Court, S. D. Ohio, W. D.

Oct. 20, 1981.

---

**852**

Paul H. Tobias, Cincinnati, Ohio, James L. Jacobson, Dayton, Ohio, for plaintiffs.

David L. Hall, Gary Susser, Dayton, Ohio, for defendants.

## DECISION AND ENTRY OVERRULING CROSS MOTIONS FOR SUMMARY JUDGMENT

RICE, District Judge.

### I. Introduction

This matter is before the Court pursuant to the Motions for Summary Judgment filed by the Plaintiffs and the Defendants. On August 19, 1981, the Plaintiffs filed their Motion for Summary Judgment with respect to Count One of the Amended Complaint, which had alleged that the Defendant, Leland Electrosystems, Inc. (Leland) violated the collective bargaining agreement entered into by Leland and Local Union #804 of the International Union of Electrical, Radio and Machine Workers (I.U. E.). Specifically, the Plaintiffs claimed that Leland had breached Article IV, § 2 of the agreement by failing to give Plaintiffs a preference in hiring.

Plaintiffs are former employees of AMF, Inc., a corporation which until June 21, 1978, owned and operated an aircraft parts and electronics equipment plant in Vandalia, Ohio. On June 21, 1978, Leland purchased the assets of the Vandalia business from AMF, and assumed its operation. Plaintiffs were also members of I.U.E., and were covered by a collective bargaining agreement between I.U.E. and AMF, which

by agreement of the parties, was extended until June 21, 1978. Prior to the time Leland purchased the assets of the business operated by AMF, Leland and the I.U.E. negotiated the contract which is the subject of this suit. That contract took effect on June 26, 1981, and provided *inter alia*, in Article IV, § 2, that:

> Employees who were employed by AMF Electrosystems Division, AMF Incorporated, on its last day of operation will be given preference in hiring by Leland Electrosystems, Inc. If hired, such former AMF employees will hold seniority sequentially in the order shown on the AMF Electrosystems Division 804 P&M Unit final Seniority List and will be recognized as having completed their probationary periods on the date of their hire. The probationary period for other newly hired employees shall be thirty (30) worked days.

Although a number of former AMF employees were hired by Leland in June and August, 1978, Plaintiffs were not given employment by Leland. In addition, in October, 1978, and thereafter, Leland began to hire new applicants who had not previously worked for AMF. Again, the Plaintiffs were not hired. Plaintiffs have contended, in moving for Summary Judgment on Count One of the amended complaint, that Article IV, § 2 is *un*ambiguous, and established that all former employees of AMF were to be given a preference in hiring over all new applicants for job openings at Leland. Plaintiffs, therefore, have maintained that they are entitled to summary judgment as a matter of law, since Leland did not give them a hiring preference over persons employed after October, 1978.

The Defendants, Leland, Gerald Fahringer (Fahringer), and Jo Lynne Csaszar (Csaszar) have moved for Summary Judgment with respect to *all* matters raised in the Complaint. Defendants first have claimed that a construction of the contract as a whole, together with the intent expressed by the parties during negotiations, reveals that Article IV, § 2 is not a *hiring* preference, but is instead a *seniority* preference,

relating solely to the terms and conditions of employment once a former AMF employee was hired by Leland. Defendants complied with that preference by considering each AMF employee for employment with Leland, and by developing an objective, non-discriminatory system for evaluating the AMF applicants. Therefore, Defendants have contended that they are entitled to summary judgment with regard to the breach of contract claims in Count One of the Amended Complaint. Count Two of the Amended Complaint alleges a conspiracy between all of the Defendants, through the employee selection process, to prevent Plaintiffs from being hired, on criteria related to, *inter alia*, union membership and activity, and employee assertiveness in advocating employee rights. All Defendants have moved for Summary Judgment in their favor with respect to this claim, because the depositions of the Plaintiffs indicate that the Plaintiffs had no personal knowledge of any facts supporting the conspiracy allegations. Defendants have further pointed out that not all former AMF employees could be hired by Leland, that the AMF employees were aware of this, and that Leland structured the employee selection process in an objective, non-discriminatory manner. Based on these factors then, Defendants have maintained that the failure to afford employment to all former AMF employees was a natural result, and as a matter of law, they did not engage in a conspiracy against any of the Plaintiffs.

The Court has considered the materials and memoranda submitted by the parties, and has concluded that genuine issues of material fact exist with regard to both Count I and Count II of the amended complaint. Accordingly, both pending Motions for Summary Judgment must be denied. The Court will now set forth the applicable law, and will then briefly address the contentions which have been raised by the parties.

## II. *Discussion*

■ Fed.R. of Civ.Pro. 56(e) provides with respect to summary judgment that:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

The rule is well established that, in determining whether summary judgment is appropriate, "the pleadings are to be liberally construed in favor of the party opposing the motion," . . . and "the court is required to take the view most favorable to the party opposing the motion, giving the party the benefit of all favorable inferences that may be drawn from the evidence." *McHenry v. Ford Motor Co.*, 269 F.2d 18, 22 (6th Cir. 1959) (citations omitted).

■ The Sixth Circuit has indicated that "[w]hether the terms of a contract are ambiguous is a question of law for the court to determine." *Tennessee Consolidated Oil Co. v. United Mine Workers of America*, 416 F.2d 1192, 1198 (6th Cir. 1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970) (citation omitted). In the present case, the Court has determined that the terms contained in Article IV, § 2 *are* ambiguous. Although Section 2 of Article IV states that former AMF employees are to be given preference in hiring, that statement is followed by the phrase, "if hired," prior to a discussion of seniority rights, which indicates that the preference is not an absolute guarantee of employment. Moreover, further confusion is introduced by the placement of the hiring preference in the portion of the bargaining agreement dealing with seniority rights. Therefore, the Court must conclude that Article IV of the contract is ambiguous.

The Sixth Circuit has also indicated that "[w]hen a contract is ambiguous, it is for the jury to determine the meaning of its terms, subject to proper instructions and based upon evidence of the surrounding circumstances and the practical construction of the parties." *Scott v. Anchor Motor Freight, Inc.*, 496 F.2d 276, 280 (6th Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42

L.Ed.2d 107 (1974) (citation omitted). Since this matter is before the Court pursuant to motions for summary judgment, the Court could grant summary judgment, even in this case, if it could be determined that no genuine issues of material fact existed with regard to the meaning of the contractual terms, the surrounding circumstances, or the construction of the parties. However, an examination of the materials submitted herein indicates that there are issues of material fact with respect to those matters. For example, the depositions submitted indicate that the parties differed with regard to whether there was a hiring preference for AMF employees, or, if there was one, with respect to its meaning and duration. Delmer Collingsworth, the International Representative for the I.U.E., who attended all the contract negotiations in 1978, indicated that his understanding of the preference was that persons who were employed by AMF on the last day of its operation would be given a preference in hiring over people who had never worked for AMF. (Collingsworth deposition, pp. 3, 5, 6, 7). Collingsworth further indicated that he understood the preference to be an "on-going thing, with no time limit," that "would take care of the people that [sic] was laid off, and they would have preference before people who had not worked for them [AMF] before." (Collingsworth deposition, pp. 7, 8, 14). Gerald Fahringer, a director and stockholder of Leland, however, indicated his position during the negotiations to be as follows:

> We will hire anybody we want to. It is a new company with no obligations to the old work force. We intend to do the bulk of our hiring from the people that formerly worked there, but we assume no obligation to do that. And that was clearly understood.

(Fahringer deposition, pp. 34, 35). Fahringer further stated that:

> [M]y assurance that the bulk of the employees would be former AMF employees was an aside. It was a new company with no priorities.
>
> . . . .

I mean this recitation I've just made has been made at every meeting.

(Fahringer deposition, p. 36).

The testimony of William Neal, who, as President of Local # 804, I.U.E., was present during all the negotiations (Neal deposition, November 6, 1979, pp. 8, 35), evidences much the same contract interpretation as Collingsworth. Neal stated that his understanding was that the Company was required to hire all the AMF employees, except for a few that the Union understood would not be recalled, ahead of persons who had not previously worked for AMF (Neal deposition, November 6, 1979, pp. 49–50). Neal further indicated that there was no time limit on the hiring preference but that the company would exhaust the list of former AMF employees. (Neal deposition, April 7, 1981, pp. 9, 10, 11, 12). Further, the testimony of Jo Lynne Csaszar, Leland Personnel Manager, indicates that while former AMF employees were to be given consideration in hiring for the June 26, 1978, commencement of business by Leland, the discussions during negotiations about hiring preferences or consideration thereafter for former AMF employees was conducted only in generalities. (Csaszar depositions, November 6, 1979, pp. 7, 193; April 8, 1981, pp. 40–41, 63–64).

Based on the above factual discrepancies, which are material to the issues of whether a hiring preference was created by Article IV, § 2, and if so, what the parties intended the effect and duration of that preference to be, the Court cannot conclude that summary judgment with respect to Count One would be appropriate for any party herein.

■ With respect to the conspiracy allegations contained in Count II, there appear to be genuine issues of material fact with regard to the existence of a conspiracy to deprive Plaintiffs of their employment for reasons relating to union activity or membership. Under Ohio law, "conspiracy in and of itself furnishes no basis for civil action. A cause of action may arise when damage results from acts committed pursuant to a formed conspiracy." *Pumphrey v. Quillen*, 102 Ohio App. 173, 177, 141 N.E.2d

675 (Summit Cty. 1955), aff'd 165 Ohio St. 343, 135 N.E.2d 328 (1956). Defendants Leland, Csaszar, and Fahringer have claimed that they are entitled to summary judgment as a matter of law with respect to the existence of an alleged conspiracy, because: (1) the Plaintiffs have not premised their allegations of conspiracy upon any personal knowledge, except the fact of their failure to be hired by Leland; (2) Csaszar did not participate in any conspiracy because she did not make employee selections, and (3) there is no evidence linking Fahringer to the actual meetings at which the employees were selected. The deposition of Tod Browning, a former employee and supervisor at AMF and Leland, indicates that during the spring of 1978, AMF supervisors met after work hours to discuss the proposed sale of AMF. (Browning deposition, pp. 3, 4, 11). During this first meeting, Csaszar informed the supervisors that AMF wanted to provide Mr. Fahringer with a good work force, and that "they" didn't want union trouble makers because they had enough trouble makers as it was right now, getting started." (Browning deposition, pp. 6, 7). Browning also stated that the group was told that Fahringer "did not want no trouble makers, he wanted a good work force." (Browning deposition, p. 6). According to Browning, there were several meetings, during which the supervisors classified the AMF employees as any one of the following: "good, bad, indifferent, union trouble maker," and that he made a list of the persons who were mentioned as trouble makers. (Browning, pp. 6, 9). Csaszar, however, indicated that while she met with the supervisors, the procedure used was that the seniority list was read, and "different supervisors would say 'I can use that one.'" (Csaszar depositions, April 8, 1981, pp. 9, 10, 11; November 6, 1979, pp. 8–12). Further, Csaszar denied giving the supervisors instructions on how to make up their lists of desired employees, but indicated that the supervisors "were free to write down the name of who [sic] they wanted to staff their department with." (Csaszar deposition, April 8, 1981, pp. 18, 19, 22). Csaszar indicated that she specifically advised the supervisors not to discriminate on the basis of factors such as age, sex or minority status, and that the employee list compiled in the last week of May, 1978, was done on the following basis:

[A]s I stated yesterday, the first list was compiled from a mass meeting with all the supervisors. We were requested, if things were to close today and you had to open up the operations tomorrow, how many do you want to operate your department, ideal situation, whomever you want, and how many you can utilize in your department, and we went down a list, went through names, and supervisors would say, just read off names, and they'd say "yes," "yes," "yes," "yes." That is how that first list that you were talking about yesterday was compiled.

(Csaszar deposition, November 6, 1979, pp. 62, 63, 67, 69).

Moreover, at the time the employee selection lists were being compiled, Fahringer and his consultant, Mr. Farris, were involved in negotiations with the I.U.E. (Csaszar deposition, November 6, 1979, pp. 123–124). Csaszar testified that Farris asked her if she would be willing to work with him in negotiations, "to get a contract for Leland," and that she reported to Farris about the negotiations until June 3, 1978, when Farris left. (Csaszar deposition, pp. 131, 134). Csaszar indicated that, after this time, she was in charge for the company's side, and reported the status of negotiations to Fahringer. (Csaszar deposition, November 6, 1979, pp. 135–136). In addition, Fahringer indicated he had taken part in negotiations with the I.U.E. as early as May, 1978. (Fahringer deposition, August 12, 1980, p. 8).

The foregoing presentation of factual matters indicates that there are issues of fact regarding Csaszar's conduct during the employee selection process, and therefore summary judgment is not appropriate with respect to the conspiracy claims against her. Moreover, although Fahringer and Leland may not have been directly involved in selecting those AMF employees who would be hired after the sale of the AMF business to

Leland, there are indications that Farris, as Fahringer's agent, and Fahringer, either on his own behalf, or as an agent for Leland, did have input or influence upon the employee selection process. At the very least, the statement in Browning's deposition that Fahringer didn't like trouble makers, coupled with Csaszar's request that union trouble makers be eliminated, raise an inference that Fahringer did have some participation in the alleged conspiracy. Accordingly, because there are factual questions pertaining to the direct or indirect participation of Fahringer and Leland in the conspiracy alleged in Count II, the Court cannot conclude at this time that either Fahringer or Leland is entitled to summary judgment.

III. *Conclusion*

Based on the preceding analysis, the Court has determined that because of the existence of genuine issues of material fact regarding all claims of the Plaintiffs:

1. Plaintiffs' Motion for Summary Judgment with respect to Count One of the Amended Complaint is not well taken and denied;

2. The Motion for Summary Judgment, filed by Defendant Leland with respect to Count One of the amended complaint and filed by all Defendants with respect to Count Two of same, is also not well taken and are denied.