Plaintiff-appellant James D. Bragg appeals from a summary judgment rendered in favor of defendants-appellees King Trucking Co., Inc., Mitchell Spencer, Roland Turner, and Tony Noble. Bragg contends that the trial court erred in granting summary judgment because the record demonstrates the existence of genuine issues of material fact concerning whether Spencer, Turner, and Noble engaged in a civil conspiracy when he and Spencer fought in a bar parking lot in the presence of Turner and Noble. In addition, Bragg argues that there are genuine issues of material fact concerning whether Spencer, Turner, and Noble were acting within the scope of their employment with their employer, King Trucking, while they were at the bar.
From our review of the record, we conclude that there is no genuine issue of material fact concerning whether Spencer, Turner, and Noble engaged in a civil conspiracy and that the defendants were entitled to judgment as a matter of law. Similarly, the record does not permit a reasonable inference that Spencer, Turner, and Noble were acting within the scope of their employment while they were at the bar. Accordingly, the judgment of the trial court is Affirmed.
 I
In 1993, plaintiff-appellant James D. Bragg was hired by defendant-appellee King Trucking Company. As a driver, Bragg was responsible for hauling various load between Dayton and Cincinnati several times each work day. Over the following year, Bragg became unhappy with the demanding driving schedule, which limited his ability to take lunch and work breaks. In early spring, 1994, Bragg and two co-employees, Tim Doble and Greg Elmer, spearheaded an effort to install the Teamster's Union as the bargaining agent for King Trucking's drivers. Bragg was perceived as the leader of the union movement by the other drivers and management. The Teamster's Union received popular support from the drivers, with the notable exception of one driver, defendant-appellee Mitchell E. Spencer, who did not believe that a union was necessary to improve working conditions. Although Bragg and Spencer had debated the merits of the union, they did not have serious arguments prior to September 21, 1994.
On that day, the drivers at King Trucking voted on a contract proposed by the management. Bragg reported to work around 5:00 — 5:30 a.m. to haul several loads to Cincinnati. Bragg and his operating supervisor, defendant-appellee Ronald L. Turner, had a disagreement about either loading the truck or the number of loads to be driven to Cincinnati. Turner and Bragg also discussed a union poster that was defaced by Spencer with the statement "Down with Bragg, in with Bird [co-employee Terry Neise] and Spencer." By 7:00 a.m., Bragg's truck was loaded and he proceeded with his work.
In the early afternoon, the drivers voted on King Trucking's proposed contract, rejecting it. Around 3:30 p.m., Bragg had finished his shift at King Trucking and went to a local tavern, the "NeedOneMore" bar, to order beer and chicken wings. At the bar, Bragg met his co-employee, defendant-appellee Anthony W. Noble, and the two drivers talked about the voting results and the union. Like Bragg, Noble also supported the union and had voted to reject management's proposed contract. Over the course of the afternoon and early evening, Bragg consumed approximately five beers and became intoxicated.
Around 6:30 p.m., Turner and Spencer arrived at the NeedOneMore bar. Spencer had finished his shift at King Trucking earlier and had stopped by the office to drop off some paperwork. At the office, he spoke with Turner, and they decided to telephone an order for chicken wings at the NeedOneMore bar and then pick up the order. Once they arrived at the NeedOneMore bar, they were told that the chicken wing order would take longer than expected, so they ordered a beer and talked with their co-employees, Bragg and Noble. Ultimately, Spencer and Bragg became involved in a heated discussion. Bragg told Spencer that they did not like each other and that they should do something about it. A short time later, Spencer left the bar and Bragg soon followed after him.
Once outside, Bragg walked toward his car and saw Spencer by his truck. The two exchanged fighting words. Bragg approached Spencer. Turner walked out of the bar and yelled at Bragg and Spencer to stop fighting. In the melee that followed, Bragg hit Spencer with his fist either once or twice. Spencer, who had grabbed a tree branch from the bed of his truck, hit Bragg multiple times in his torso. At some time, Noble drove around from the other side of the parking lot and stopped his car, approximately ten feet from the right corner of Bragg's car, and got out next to it to watch the altercation. After the last blow, Bragg walked, bent over, to his car. Spencer got in his truck and drove Turner back to King Trucking's office where Turner's car was parked. Noble talked with Bragg for a few minutes after the fight, then drove home. Bragg walked into the bar and asked for a drink of water. Eventually, Bragg drove home and passed out. Bragg's son called an ambulance, which took Bragg to the hospital. As a result of his injuries, Bragg suffered five separated ribs, a partially collapsed lung, and later, a ruptured spleen.
Bragg brought an action against Spencer, Noble, Turner, and King Trucking. Bragg claimed that Spencer, Noble, and Turner had engaged in a civil conspiracy to injure him, physically, in order to advance the interests of King Trucking. Bragg also claimed that King Trucking was vicariously liable for the actions of its employees and was also liable for negligently retaining Spencer as an employee despite his violent propensity. Finally, Bragg alleged that Spencer had committed the tort of assault and battery.
In due course, all of the defendants filed motions for summary judgment. The trial court sustained all of the defendants' motions for summary judgment, except Spencer's motion, which it sustained in part, dismissing Bragg's civil conspiracy claim, but also denied in part, permitting Bragg's assault and battery claim to go to trial. The trial court certified that there was no just reason for delay in the entry of final judgment in favor of the defendants other than Spencer, pursuant to Civ. R. 54(B).
From the summary judgment rendered against him, Bragg appeals.
 II
Bragg's First Assignment of Error is as follows:
 THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO TURNER AND NOBLE ON BRAGG'S CIVIL CONSPIRACY CLAIM.
Bragg contends that the trial court erred in applying the civil conspiracy doctrine. Bragg maintains that the doctrine of civil conspiracy only requires a common understanding between the parties, not an express agreement. With respect to Spencer, Turner, and Noble, Bragg argues that their conduct before and during the fight raises a genuine issue whether they had a common understanding that they would all participate in attacking Bragg in the parking lot of the NeedOneMore bar.
Pursuant to Civ.R. 56(C), summary judgment is proper where the trial court determines the following:
 The appositeness of rendering a summary judgment hinges upon the tripartite demonstration: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.
Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64,66, 8 O.O.3d 73, 74 375 N.E.2d 046, 47.
"Once summary judgment is requested, the responding party must set forth specific facts demonstrating triable issues on all essential matters for which he bears the initial burden of proof."Shaw v. J. Pollock Co. (1992), 82 Ohio App.3d 656, 659,612 N.E.2d 1295. As this court observed in Napier v. Brown (1985),24 Ohio App.3d 12, 13-14, 24 OBR 33, 492 N.E.2d 847, the primary function of a trial court in reviewing a motion for summary judgment is to determine whether triable issues of fact exist, not to determine the weight of those facts or the credibility of the witnesses. Similarly, this court must independently review the record to determine whether summary judgment was appropriate.Swartz v. Bank One, Portsmouth, N.A. (1992), 84 Ohio App.3d 806,809, 619 N.E.2d 10.
"In Ohio, a civil conspiracy consists of the following: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." Universal Coach, Inc. v.New York City Transit Auth., Inc. (1993), 90 Ohio App.3d 284, 292,629 N.E.2d 28, citing Minarik v. Nagy (1963), 8 Ohio App.2d 194,196, 26 O.O.2d 359, 360, 193 N.E.2d 280, 281. With respect to a malicious combination, "[a]ll of those who actively participate, by co-operation or request, in a tortious act * * * which results in damage, or who lend aid to the wrongdoers, or ratify or adopt the acts done for their benefit, are equally liable with him."Pumphrey v. Quillen (1955) 102 Ohio App. 173, 177, 2 O.O.2d 152,141 N.E.2d 675. "Express agreement is not necessary, and all that is required is that there should be a common design or understanding, even though it be a tacit one." (Citation omitted.) Id. at 177-178. "The ultimate fact of conspiracy is solely a question for the jury, unless the court can say, as a matter of law, that there is no proof tending to establish a conspiracy." LeFort v. Century 21-Maitland Realty Co. (1987),32 Ohio St.3d 121, 126, 512 N.E.2d 640, citing Liston v. Statler
(1917), 9 Ohio App. 398, 401.
In the decision of the trial court in the case before us, the court stated the following:
 The facts before the court fail to suggest an agreement between Defendants Spencer, Noble, and Turner to cause harm to Plaintiff Bragg. First, the circumstances surrounding the Defendant and Plaintiff meeting at the bar are more indicative of an incidental meeting rather than an intentional agreement. Defendants Spencer and Turner were at the bar to pick up a carry out order. Defendant Noble and Plaintiff Bragg has been at the bar for approximately three hours drinking. Second, once at the bar, there was [sic] no facts presented that suggest an agreement between Defendants to harm Plaintiff Bragg. Plaintiff Bragg concludes the Defendants met in the back to plan a fight. Rather, Defendants provided information that the only reason for them being in the back room was to play pool while waiting for a carry out order. Third, the Defendants provided facts which suggest the fight did not result from an agreement between the parties. Rather, Plaintiff Bragg stated he fought Defendant Spencer because he does not back down from a fight. Thus, no genuine issue of material fact exists [with respect to] Plaintiff's claim of civil conspiracy against Defendants Turner and Noble.
(Emphasis added.)
We disagree with Bragg's argument that the trial court applied the wrong standard in applying the civil conspiracy doctrine. The trial court's use of the word "intentional" in the context of the preceding paragraph does not suggest that the trial court was looking for an express agreement between the parties. In fact, the trial court explained that the facts surrounding the fight did not suggest any agreement between the defendants. However, since this court has an obligation to review the record independently, we must decide for ourselves whether the facts permit a reasonable inference that there was a tacit understanding between the defendants to cause harm to Bragg.
In his deposition, Bragg testified that when he arrived at the NeedOneMore bar, he sat with Noble to discuss the union vote. During the course of the evening, Bragg drank five beers and became intoxicated. Bragg testified that after having words with Spencer at the bar, he said to Spencer, "You don't like me and I don't like you, what we gonna do about it? — We can go outside and we'll settle it like men if you want." (Bragg Dep. at 40, 42). Turner, who heard this exchange, said, "You guys don't want to do this." (Bragg Dep. at 135). Bragg testified that after this exchange, Turner, Spencer, and Noble went to the pool room and talked. Eventually, Spencer, Turner, and Noble left the bar. Bragg also left the bar and, on his way out, used the public telephone by the entrance to call John Buzard, the vice president of the Teamster's Union local. Bragg told Buzard that he was going to get into trouble and that he might need someone to bail him out of jail, but Buzard told Bragg to drive home. (Bragg Dep. at 142-143). Once outside the bar, Bragg walked to his car and saw Spencer standing by his truck, Turner leaning on the back of a car, and Noble pulling his car around the corner of the bar and parking it ten feet from the right corner of Bragg's car. Bragg testified that he saw a club in Spencer's hand, so he approached Spencer and inquired about the club. After approaching Spencer, the two exchanged blows, and Bragg received, by his account, six or seven blows to his body from the wooden club.
When asked why he did not get into his own car to avoid an altercation, Bragg testified that he didn't run from a fight because of his past military training. Bragg testified that he did not know if Turner or Noble said or did anything during the altercation because he was focusing his attention on Spencer. (Bragg Dep. at 156-157). In addition, Bragg testified that he never heard the content of the discussion between Spencer, Turner, and Noble while they were in the pool room or at any point prior to the fight. (Bragg Dep. at 164-166).
Noble testified in his deposition that when he arrived at the NeedOneMore bar, he parked his car away from the other cars in the parking lot because his car was freshly painted. Once inside, he and Bragg talked about the union vote while he drank a Coke. After Spencer and Turner had arrived, Bragg appeared intoxicated and eventually got into an argument with Spencer about the union and about Spencer getting paid "under the table" by King Trucking. Noble testified that Bragg told Spencer that he would "whip his ass" and that eventually Spencer left the bar. Soon after, Noble saw Bragg leave the bar, at which point Noble and Turner talked about stopping the two from fighting. After Turner left the bar, Noble went to his car, but did not see anyone in the parking lot. As he drove around the corner of the parking lot to the exit, he saw Spencer and Bragg arguing with each other while Turner stood by and watched. Noble got out of his car and heard Bragg tell Spencer to drop his stick and "fight like a man". Noble testified that he did not see any blows being exchanged. Eventually, Spencer and Turner left the parking lot in Spencer's truck, and Noble talked to Bragg about the altercation. Bragg told Noble that Spencer had hit him several times, but that he was never knocked down.
Turner testified that he and Spencer arrived at the NeedOneMore bar to pick up their chicken wing order and eventually engaged in congenial conversation with Bragg and Noble. During the course of the evening, Bragg became belligerent and told Spencer that he would own King Trucking someday and fire Spencer and that Spencer was getting paid "under the table". Eventually, Spencer told Turner that the chicken wing order was ready, and he left the bar. Turner noticed that Bragg was no longer in the bar, so he talked to Noble. Noble told Turner that Bragg and Spencer were going to fight. Turner testified that he left the bar and walked around the corner and saw Spencer and Bragg approaching each other in a menacing manner. Turner claims that he yelled at them to stop fighting, but they still exchanged blows, with Bragg throwing the first punch. Turner saw Spencer hit Bragg twice with a wooden stick. After Spencer hit Bragg, Turner saw Noble drive around the corner in his car and park three to four car lengths from Bragg's car to watch the altercation. After the fight, Spencer dropped Turner off at the King Trucking office so he could retrieve his car. Turner then drove back to the NeedOneMore bar to check on Bragg, who was no longer there.
Spencer testified that he and Bragg had an antagonistic relationship prior to the date of the fight, over the union issue, but that they had never had a serious argument. While at the NeedOneMore bar, Spencer saw Bragg harass Turner about someday owning King Trucking and replacing Turner in his job. Turner avoided confrontation with Bragg by telling him that the bar was no place to talk about business. Bragg then began to harass Spencer by accusing him of getting paid "under the table" and having two time cards. Eventually, the waitress at the bar told Spencer that his chicken wing order was ready, so, after informing Turner, Spencer left the bar. Spencer testified that as he approached his truck in the parking lot, Bragg came out of the bar door and threatened him. As Bragg approached Spencer, Turner walked out of the bar and told Bragg to stop fighting. Spencer then saw Noble walk out of the bar and walk toward his car on the other side of the parking lot. When Bragg reached Spencer, he hit him in the neck with his fist. Spencer then grabbed a tree limb from the bed of his truck and struck Bragg twice with the makeshift club. After the second blow, Bragg bent over, walked to his car, and leaned up against it. At that point, Spencer left the parking lot and drove Turner back to the King Trucking office.
After reviewing the evidence most favorably to Bragg, we conclude that there is insufficient evidence, as a matter of law, to permit a reasonable inference that Spencer, Turner, and Noble engaged in a civil conspiracy to cause harm to Bragg. In order to show a civil conspiracy, the evidence must support a reasonable inference that Spencer, Turner, and Noble had an tacit understanding that they would assist each other for the purpose of harming Bragg. The record lacks any evidence of an implicit understanding between the parties to that effect.
Bragg points to four facts that purportedly support a reasonable inference that Spencer, Turner, and Noble had an understanding that they would harm Bragg: (1) the conversation between Spencer, Turner, and Noble in the pool room prior to the fight; (2) Noble parking his car in such a manner as to prevent Bragg from driving away from the fight; (3) Noble's and Turner's failure to intercede in the altercation to stop the fighting; and (4) Spencer's and Turner's opposition to the unionization of King Trucking.
In reviewing a motion for summary judgment, this court should not weigh the evidence or assess credibility, but rather it should determine whether there is sufficient evidence to support the essential elements of the non-moving party's claim. Napier,24 Ohio App. 3d at 13-14. However, "[a]ssessing the sufficiency of the evidence involves a qualitative, as well as a quantitative, analysis. Therefore, in addition to considering the amount of evidence presented on an issue, the court must consider whether the evidence makes a party's claim plausible." Paul v. UniroyalPlastics Co. (1988), 62 Ohio App.3d 277, 282, 575 N.E.2d 484, citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.
(1986), 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-1356,89 L.Ed.2d 538, 552.
By Bragg's own admission, he did not hear the conversation between Spencer, Turner, and Noble in the pool room, or any conversation between the three individuals prior to the fight. While the pool room discussion suggests that Spencer, Turner, and Noble communicated with each other, the content of their communication is not revealed and any attempt to assign meaning to their discussion is speculative.
Another fact relied upon to suggest a mutual understanding among the defendants is that, according to Bragg, Noble parked his car in such a manner as to block Bragg's ability to escape from the fight. Bragg's interpretation of the record, however, is not supported by his own testimony:
 Counsel: You — you've indicated in you — alleged in your complaint that [Noble's] vehicle blocked yours so as to render it unable to leave the parking lot. So are you saying you couldn't back out of your space?
 Bragg: I could have got out of the spot but, like I said, with the length of that Cadillac and the room to get around him I'd have had trouble doing it.
 Counsel: At any point in time did you ask Mr. Noble to move his vehicle?
Bragg: No, I didn't.
(Bragg Dep. at 167-168).
By Bragg's own admission, Noble's car was parked at least ten feet away from his Cadillac with enough space to back out, albeit with some degree of difficulty. Moreover, Bragg admitted that he did not attempt to leave the parking lot in his Cadillac prior to the fight and did not ask Noble to move his car at any time. From these facts, a trier of fact could not reasonably infer that Noble assisted Spencer by parking his car in such a manner as to block Bragg's Cadillac and prevent his escape. Had Noble intended to block Bragg, he would almost certainly have left no room for Bragg to maneuver, rather than to create a situation where Bragg, known by Noble to be somewhat intoxicated, might seek to escape, but have a high risk of hitting Noble's car in the process.
We also find the fact that Turner and Noble did not physically intervene to prevent the fight unpersuasive in supporting Bragg's theory that they had an implicit understanding that they would cause him harm. "Generally, under Ohio law, there is no duty to prevent a third person from causing harm to another absent a special relation between the parties." Simpson v. BigBear Stores Co. (1995), 73 Ohio St.3d 130, 133, 652 N.E.2d 702, citing Littleton v. Good Samaritan Hosp. Health Ctr. (1988),39 Ohio St.3d 86, 92, 529 N.E.2d 449, 455. "`The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.'" Hill v. Sonitrol of SouthwesternOhio, Inc. (1988), 36 Ohio St.3d 36, 39, 521 N.E.2d 780, quoting Restatement of the Law 2d, Torts (1965) 116, Section 314. "A person who intervenes in a struggle and has no duty to do so, acts at his own peril if the person assisted was in the wrong." (Footnote omitted.) State v. Wenger (1979), 58 Ohio St.2d 336,339, 12 O.O.3d 309, 311, 390 N.E.2d 801, 803. A trier of fact could not reasonably interpret Turner's and Noble's failure to intervene physically in the fight as complicity where they had no duty to intervene and where they may have subjected themselves to liability had they done so.
Finally, Turner's managerial position as operations supervisor and Spencer's endorsement of King Trucking's management do not, by themselves, lend credence to Bragg's conspiracy theory. In fact, one of the purported participants in the conspiracy, Noble, endorsed the union and voted with the other drivers to reject management's contract proposal. Bragg offers no explanation for Noble's alleged sudden change of heart in assisting management in beating up a union representative.
We conclude that, as a matter of law, there is no evidence from which a jury could reasonably infer that Spencer, Turner, and Noble engaged in a civil conspiracy to harm Bragg.
Bragg's First Assignment of Error is overruled.
 III
Bragg's Second Assignment of Error is as follows:
 THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO KING TRUCKING CO., INC. ON BRAGG'S CLAIM THAT SPENCER, TURNER AND NOBLE WERE ACTING IN THE COURSE AND SCOPE OF THEIR EMPLOYMENT.
Bragg contends that the record portrays genuine issues of material fact whether Spencer, Turner, and Noble were acting within the scope of their employment while they were at the NeedOneMore bar. Specifically, Bragg contends that the record supports a reasonable inference that Spencer, Turner, and Noble were furthering the interests of King Trucking while they were at the bar. Bragg suggests that the failure of the union movement after the day of the fight permits a reasonable inference that King Trucking management had a vested interest in removing Bragg from his role as union representative. In addition, Bragg contends that the purported acts of Spencer, Turner, and Noble while at the NeedOneMore bar were not so divergent from the scope of their employment as to sever the employment relationship.
The doctrine of respondeat superior was exhaustively described in Osborne v. Lyles (1992), 63 Ohio St.3d 326, 329-330,587 N.E.2d 825:
 The doctrine of respondeat superior is expressed in the Restatement of the Law 2d, Agency (1958) 481, Section 219(1), which states as follows: "A master is subject to liability for the torts of his servants committed while acting in the scope of their employment." Ohio law provides, "[i]t is well-established that in order for an employer to be liable under the doctrine of respondeat superior, the tort of the employee must be committed within the scope of employment. Moreover, where the tort is intentional, * * * the behavior giving rise to the tort must be `calculated to facilitate or promote the business for which the servant was employed * * *.'" (Citations omitted.) Byrd v. Faber (1991), 57 Ohio St.3d 56, 58, 565 N.E.2d 584, 587. In general, "an intentional and wilful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from his employment and his principal or employer is not responsible therefor. * * *" (Citations omitted.) Vrabel v. Acri (1952), 156 Ohio St. 467, 474, 46 O.O. 387, 390, 103 N.E.2d 564, 568. Stated otherwise, "an employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." Byrd, supra, 57 Ohio St.3d at 59, 565 N.E.2d at 588.
A willful and malicious act may still be within the scope of employment, unless the character of the act is so divergent that it severs the employment relationship. Id. at 330 (Citations omitted.) Whether or not an employee is acting within the scope of his employment is a question of fact; however, it becomes a question of law when the facts are undisputed and all reasonable inferences are not in conflict. Id. (Citations omitted.)
In their depositions, Spencer, Turner, and Noble all testified that they were at the NeedOneMore bar after their work shift had ended. They all testified that they were not at the bar at the instruction of King Trucking. Rather, Spencer, Turner, and Noble testified that they went to the NeedOneMore bar that night because it was "chicken wing" night, and they wished to order some chicken wings. Spencer and Turner further testified that they drank alcohol while at the bar, an act that they acknowledged could lead to disciplinary action if it took place during working hours.
In sum, there is no evidence in the record that raises a reasonable inference that the presence of Spencer, Turner, and Noble at the NeedOneMore bar was within the scope of their employment. In addition, there is no evidence to suggest that Spencer's fight with Bragg was calculated to further King Trucking's business interests; to the contrary, the evidence strongly suggests that the fight was a "barroom brawl," engaged in by the participants to vent their own personal animosity. The ultimate failure of the union movement at King Trucking, while possibly caused by Bragg's absence from his role as union representative, does not permit a reasonable inference that King Trucking plotted to remove Bragg by instructing its employees to harass or physically assault him. Thus, we conclude that there is no genuine issue of material fact and that a jury could not reasonably infer that Spencer, Turner, and Noble were acting within the scope of their employment while at the NeedOneMore bar.
Bragg's Second Assignment of Error is overruled.
 IV
Both of Bragg's assignments of error having been overruled, the judgment of the trial court is Affirmed.
YOUNG, P.J., and WOLFF, J., concur.
Copies mailed to:
David C. Greer
Carla J. Morman
Phillip D. Hoover
Edward J. Dowd
Brian L. Wildermuth
John T. McLandrich
Richard A. Mains
Myron A. Wolf
Hon. Barbara P. Gorman