**DE BOER STRUCTURES (U.S.A.), INC., et al., Plaintiffs,**

v.

**SHAFFER TENT AND AWNING CO., et al., Defendants.**

**No. 2:00–CV–615.**

United States District Court,
S.D. Ohio,
Eastern Division.

Dec. 11, 2001.

---

912

D. Wesley Newhouse, II, Lane Alton &
Horst—2, Columbus, OH, William H. Pro-
phater, Jr., Jeffrey M. Silverstein & Asso-
ciates—3, Dayton, OH, John M. Murphy,
William Lynch Schaller, William J. Dor-
sey, Baker & McKenzie, Chicago, IL, for
Plaintiffs.

Michael A. Snyder, Shumaker Loop & Kendrick, Columbus, OH, Michael V. Kell, Kell & Lynch—2, Birmingham, MI, Robert Harrod Willard, Reminger & Reminger Co., L.P.A.—2, Eugene Louis Matan, Matan Geer & Wright, Columbus, OH, Clarence Pozza, Jr., Leland D. Barringer, Kristen L. Isaacson, Richard J. Seryak, Miller Canfield Paddock & Stone, Detroit, MI, for Defendants.

## OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court on the Plaintiffs' Rule 65 Motion for Preliminary Injunction and Imposition of a Constructive Trust and Rule 66 Motion for Appointment of a Receiver. (Doc. # 2 and # 35). The Court began a hearing on Plaintiffs' motions on March 19 and 20, 2001. The parties reached a tentative settlement on March 22, 2001. Thereafter, certain contingencies contained in the settlement agreement did not occur. The Plaintiffs requested that the hearing be reconvened. The matter came before the Court for conclusion of the hearing on November 26 and 27, 2001. As stated in open-court and, for the reasons that follow, the Plaintiffs' motions for preliminary relief are granted in part and denied in part.

## I.

Plaintiffs DeBoer Structures Inc., U.S.A., DeBoer Structures Inc., UK and DeBoer Structures BV International [collectively referred to as "DeBoer"] bring this action against former employee William Woodward for breach of fiduciary duty (Count I of Plaintiffs' Amended Complaint) arising from Woodward's actions in connection with his acquisition of Defendant Shaffer Tent and Awning Company ["Shaffer"], an Ohio corporation. Also named as Defendants are Theodore G. Pappas, former President and controlling shareholder of Shaffer; Linda C. Truxell, an attorney who assisted in the sale of Shaffer; and 21st Century Productions, Inc., a Michigan corporation formed by Defendants Woodward and Truxell to acquire Shaffer. Plaintiffs assert claims against these Defendants for conspiracy to breach fiduciary duties (Count II); fraud (Count III); conspiracy to defraud (Count IV); violation of the Ohio Trade Secrets Act, R.C. § 1333.61 (Count V);tortious interference with contract (Count VI); tortious interference with prospective economic advantage (Count VII); and breach of joint venture (Count VIII).

The Court has jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs' Motions for Preliminary Relief encompass only Counts I–IV of the Amended Complaint; the remaining counts seek monetary relief.

DeBoer, whose business is based in the Netherlands, is the leading manufacturer and supplier of temporary structures used at significant sporting, social and cultural events around the world. Mr. Klaas De-Boer is the CEO of DeBoer Investments BV, which owns all stock in the various DeBoer affiliates. Among the structures manufactured and supplied by DeBoer are large tents used to accommodate professional golf tournaments. DeBoer supplied structures to the PGA Tour in Europe in 1998 and 1999.

In 1996, DeBoer began exploring the potential for entry into the North American structures market. DeBoer provided structures for the 1996 Olympic Games in Atlanta, Georgia and opened a United States office in Atlanta that year. Mr. William Woodward, of DeBoer U.K., was DeBoer's International Sales Director from October 1991 to March 1999. In this capacity, Woodward was responsible for exploring potential acquisitions and joint ventures for DeBoer in North America. In July 1998, Woodward informed Klaas DeBoer that Shaffer, the leading supplier of tents for the PGA Tour in the United

States, was for sale. Woodward informed DeBoer that he would prepare a report on the potential acquisition.

Woodward provided DeBoer with an International Sales Report on July 28, 1998. (*Plaintiffs' Exhibit 5*). The report detailed DeBoer's activity in various world markets, including the United States. In the report, Woodward provided a detailed analysis of the potential benefits to be derived from a venture with and/or purchase of Shaffer. Woodward described Shaffer as a "company of long standing," [1] of which 51% of the stock is held by Ted Pappas and 49% is held by Pappas' stepson, Steve Spalding. Woodward stated that Pappas, at the age of seventy, "feels that now is the right time to sell his company with the major asset being the PGA Tour work . . . ." (*Id.*). Woodward noted that while the PGA desires a more European style structure for tournaments in the United States, Pappas is reluctant to enter into such a significant investment in new equipment at his age. Woodward further stated that "[t]he PGA is committed to Shaffer Sports, who [*sic*] has served them so well, and will not move all their work to a European company unilaterally. In my conversations with the head of the PGA, he stated that they would prefer that Shaffer integrates or affiliates itself to a European partner with a gradual fading

out of Shaffer style equipment." (*Id.*). In his report, Woodward concluded that DeBoer could enter into a purchase agreement with Shaffer over a five year period at a price of eight to ten million dollars.[2] (*Id.*).

Unbeknownst to Klass DeBoer, Woodward had earlier expressed to Pappas, in July 1998, his desire to purchase Shaffer. Woodward had met with Pappas in the United States on July 10, 1998 for the purported purpose of determining whether DeBoer could acquire Shaffer.

While en route to the July 1998 meeting, Woodward met Truxell on an airplane on July 9, 1998. According to Woodward, he told Truxell of the DeBoer business engagement and invited Truxell to the July 10 meeting to "take notes." The July 10 meeting included Pappas, Woodward, Truxell, and PGA Tour Executives Hardwick, Hughes and Goring. At the meeting, Woodward learned of the PGA's interest in European style structures. According to Woodward, Mr. Hughes was highly impressed with the structures made by DeBoer. Following the meeting with the PGA executives, Woodward and Truxell met separately with Pappas. Woodward told Pappas that if DeBoer did not want to purchase Shaffer, he would be interested in the purchase.[3] Truxell testi-

---

1. Pappas purchased Shaffer, which is headquartered in Coshocton, Ohio, in 1966. Shaffer began supplying tents for golf tournaments in 1972. In the 1980s, Shaffer entered into an agreement with the PGA. Pappas testified that 99% of Shaffer's revenue is derived from PGA tour proceeds.

2. Woodward failed to disclose that he could buy Shaffer for 7.5 million dollars.

3. The Court discredits this testimony of Woodward. Klaas DeBoer testified that he had no idea that Woodward was attempting to buy Shaffer until March 2, 1999. (*See* p. 11, *infra*). This question is critical since it involves the issue of whether Woodward was

open and honest with his employer. The Court credits Klaas DeBoer's testimony for three reasons: First, Woodward left an extensive paper trail on all other matters in this case other than his claimed disclosure of his personal interest to purchase Shaffer. The absence of documentation on this important issue discredits Woodward's testimony. Second, Woodward, as shown at pp. 8–10, *infra*, corresponded with Pappas to conceal information from DeBoer. Had he disclosed his interest in Shaffer to Klaas DeBoer, the secret memos to Pappas would have been unnecessary. Third, having observed the testimony of Klaas DeBoer and Woodward, this Court finds Klaas DeBoer more credible.

fied that she was aware of Woodward's intention.

Woodward testified that, while he prepared the July 28, 1998 report for DeBoer regarding DeBoer's possible acquisition of Shaffer, he continued to speak with Truxell about his own individual desire for the purchase. Woodward testified that by August 1998, he and Truxell communicated to Pappas that they would purchase Shaffer for 7.5 million dollars. While Woodward testified that he informed Klass DeBoer in July 1998 of his intent to purchase Shaffer in the event that DeBoer did not, Klass DeBoer testified that he did not learn of Woodward's desire until March 1999.

On August 6, 1998, Woodward met with Pappas, Truxell[4] and PGA Tour executives. The PGA representatives informed Woodward that it intended to solicit bids for a five year contract estimated at between thirty-seven to forty million dollars. The PGA also expressed to Woodward its desire for DeBoer's European style structures. Following the meeting, Woodward prepared a report dated August 14, 1998 and entitled "DeBoer/Shaffer Sports" "Acquisition and Future." (*Plaintiffs' Exhibit 7*). In the report, Woodward addressed the PGA's desires and bid as well as various options for DeBoer, including the possibility of purchasing Shaffer over a three to five year period, or contracting with Shaffer to service the PGA tour's needs. The report makes no mention of Woodward's individual efforts to purchase Shaffer.

Prior to his report, on August 9, 1998, Woodward prepared some notes for Truxell regarding "The New Co.," *i.e.,* the business Woodward intended to form to acquire Shaffer. (*Plaintiffs' Exhibit 6*). Woodward testified that he did not disclose his notes to Klaas DeBoer. On the same date, Truxell faxed to Woodward various pages from her law school text on corporations regarding the fiduciary duty of loyalty. (*Plaintiffs' Exhibit 9*). Truxell noted her concern that "[i]t is in the best interest for all of us to continue [our discussions] confidentially." (*Id.*).

On August 11, 1998, Truxell faxed to Woodward a "Proposal to buy Shaffer Sports" (*Plaintiffs' Exhibit 11*) which included Woodward and Truxell obtaining shares of Shaffer. Woodward testified that he understood that in order to obtain the financing to purchase Shaffer, the PGA bid contract would have to be issued and the PGA would have to be assured that it would receive the European style structures it desired.

On August 25, 1998, Klass DeBoer sent a letter to Woodward complimenting him on the August report and concluding that "we very much [would] like to join up with Shaffer Sports on a short term." (*Plaintiffs' Exhibit 12*). DeBoer further noted that "we believe that when we go into a take over of Shaffer Sports we will go into a pre-marriage stage for the 1st year. . . . After a season or a year and after we have done our due diligence we can come to a final agreement and then look in the future for a period of 3 to 5 years." (*Id.*). DeBoer concluded by stating that he hopes to "move very fast" on such negotiations in an attempt to enter the American market. (*Id.*). Klaas DeBoer testified that it was the decision of the DeBoer board that a one year pre-marriage agreement be entered into with Shaffer. DeBoer further testified that, as of August 1998, it was the decision of the board to not purchase Shaffer outright. According to Woodward, Pappas was not interested in the "pre-marriage" arrangement proposed by DeBoer.

4.  On July 10, 1998, Pappas retained Truxell to act as counsel in regard to the sale of Shaffer.

On August 27, 1998, Pappas, on behalf of Shaffer, and Woodward, on behalf of De-Boer, entered into a "Cooperation Agreement." (*Plaintiffs' Exhibit 13*). The agreement states that its purpose is to "jointly provide equipment and services to the PGA Tour Championship Management upon the successful award of a multi-year multi-tournament contract . . . ." (*Id.*). The agreement stated that both parties agree to jointly provide the tentage, equipment, design and services for a period of three years commencing in January 1999. (*Id.*).

On August 27, 1998, Shaffer and DeBoer submitted a bid to the PGA Tour for a three year period commencing in 1999. The bid notes that "a Shaffer/DeBoer partnership will guarantee Championship Management the Quality and distinctive look you want to acquire." (*Plaintiffs' Exhibit 14*). Woodward testified that Shaffer and DeBoer worked together to prepare the bid submission. Truxell testified that the bid was prepared with the anticipation that if Shaffer did not have the equipment to fulfill the agreement, it could lease the same from DeBoer. On October 16, 1998, the PGA tentatively accepted the bid proposal by "Letter of Agreement." (*Plaintiffs' Exhibit 24*). The agreement was signed by Paul Hardwick on behalf of the PGA; Ted Pappas on behalf of Shaffer; and Bill Woodward on behalf of DeBoer. On October 26, 1998, Klaas DeBoer wrote to Pappas expressing congratulations on the "Letter of Agreement" which "had been awarded to Shaffer Sports with De-Boer in support." (*Defendants' Exhibit 16*). Klass DeBoer wrote a similar congratulatory letter to Mr. Hardwick of the PGA. (*Defendants' Exhibit 17*).

Prior to this time, Truxell and Woodward continued discussions regarding their possible acquisition of Shaffer. In particular, on September 1, 1998, Truxell noted her thoughts on the possible share structure for the "new company." (*Plaintiffs' Exhibit 18*). Woodward testified that he did not provide this information to Klaas DeBoer because, according to Woodward, and denied by Klaas DeBoer, DeBoer knew in July 1998 of Woodward's intention to buy Shaffer. Also during September 1998, Woodward and Truxell prepared a reported entitled "A Sleeping Beauty: Shaffer Sports Events, the Acquisition and the Awakening" (*Plaintiffs' Exhibit 19*) to circulate to potential investors in order to generate capital for the new company. Woodward testified that the report was not disclosed to Klass DeBoer.

In October 1998, Woodward and Truxell formed 21st Century Productions—the new company that would acquire Shaffer. On October 1, 1998, Woodward executed an Option Agreement with Steve Spaulding pursuant to which Woodward would have a right of first refusal to purchase Spaulding's 48 shares of Shaffer stock. The agreement was contingent upon Shaffer securing a PGA contract. (*Plaintiffs' Exhibit 20*). Spaulding testified that he did not inform Pappas, the PGA tour or DeBoer of this agreement. On October 14, 1998, Woodward and Truxell executed an Agreement regarding their acquiring a controlling interest in Shaffer. (*Plaintiffs' Exhibit 21*). Woodward testified that De-Boer was never privy to this document.

On October 19, 1998, Pappas, on behalf of Shaffer, and Woodward, on behalf of DeBoer, executed a "Cooperation Agreement" similar to the one earlier signed in August 1998, with the exception that the October agreement stated that DeBoer will make their equipment available for the performance of the PGA Agreement either as "an owner, partner or supplier of Shaffer throughout the life of the contract." (*Plaintiffs' Exhibit 31*). In addition, the October Cooperation Agreement provides

for a five year, rather than a three year term.

Klaas DeBoer testified that he never was given a copy of this agreement and learned of it for the first time in 1999. DeBoer testified that it was not his intent to act as a mere supplier to the PGA tour. Rather, he wanted a direct relationship with the PGA. DeBoer further testified that Woodward never presented the agreement as an arrangement in which DeBoer acted as only a supplier to Shaffer.

By late October 1998, Woodward was working to keep his employer, DeBoer, from becoming a party to the ultimate PGA five year contract. On October 30, 1998, Woodward sent some notes to Pappas reiterating that if Pappas "ma[d]e waves to the PGA ... [he would] end up with a Shaffer/DeBoer contract from the PGA which in hard terms means you don't have a company to sell, for by the end of the 5th year DeBoer will be in control." (*Plaintiffs' Exhibit 25* ). Woodward further noted that "the only way to retain your asset at this time is to be quiet and wait for the contract to be issued in the name of Shaffer Sports Events." (*Id.*).

On November 8, 1998, Ted Pappas sent some written notes to Truxell expressing concern over Woodward's ability to acquire Shaffer if the PGA contract were issued in the name of Shaffer/DeBoer. (*Plaintiffs' Exhibit 28* ). Truxell responded to Pappas' concern by stating that Shaffer has a five year cooperation agreement with De-Boer under which DeBoer is to provide equipment for the PGA Tour contract. Thus, according to Truxell, "[t]his does not have any relation to Bill buying Shaffer." (*Plaintiffs' Exhibit 29* ). Nonetheless, Truxell stated that if the PGA contract were issued jointly to DeBoer and Shaffer, the value of Shaffer would be "greatly reduced;" therefore, Truxell concluded that "it is extremely important to get the contract in the name of Shaffer alone."

(*Id.*). Truxell directed Pappas as to how to proceed in discussions with Paul Hard-wick of the PGA. In particular, Truxell told Pappas to make sure that the contract would be issued in Shaffer's name alone and to tell Hardwick that DeBoer would not be interested in a joint contract. (*Id.*). Truxell further states that if Hardwick is not receptive to this, Woodward could speak to him and reiterate that DeBoer would not want a joint contract. (*Id.*).

Woodward testified that after three experiences with performing under joint contracts, Klaas DeBoer in fact was not interested in joint contracts. Woodward acknowledged however, that DeBoer never told him that he did not want to be a party to the PGA Tour contract.

On December 10, 1998, Woodward sent a list of thoughts for Pappas to consider in advance of "the upcoming visit by the De-Boers" on December 11–12, 1998. (*Plaintiffs' Exhibit 36* ). He also noted that when the DeBoers visit, he [Woodward] "shall be wearing [his] DeBoer hat ...." (*Id.*). In particular, Woodward tells Pappas that "Klaas wants a long term contract and you and I would prefer a tournament by tournament deal...." (*Id.*). Woodward goes on to tell Pappas to suggest a "rolling contract" with DeBoer. (*Id.*). With regard to his employer, Woodward also noted with respect to the DeBoers' visit that, while Pappas will "know the answers now to some of my questions which may at times appear stupid to you as we have probably already talked around the subject, but they won't be to the Dutch." (*Id.*). Pappas testified that he did not inform DeBoer of the possibility of Woodward acquiring Shaffer.

On December 4, 1998, Pappas had written some notes for Woodward indicating that he was "very uncomfortable about this visit from Klaas" because "I don't like lying to him and/or playing games with

him. I've tried to be honest all my life and I hate to start telling lies now." (*Plaintiffs' Exhibit 33*).

Klaas DeBoer met with Pappas and Woodward in Coshocton, Ohio in December 1998. DeBoer testified that he told Pappas of his desire to acquire Shaffer after one year. Pappas informed DeBoer of the PGA's desire for 900 square foot, six-sided style tents. DeBoer stated, however, that he was only willing to manufacture 900 square foot, four sided tents.

In January 1999, Woodward sent a fax to Truxell stating "we have no real evidence that Shaffer is to be given the [PGA] contract in the near future and that it will be in the sole name of Shaffer .... The contract was won on the basis that DeBoer would support Shaffer. We cannot without the contract being issued alert either the PGA or DeBoer that the scenario will change." (*Plaintiffs' Exhibit 59*).

On January 2, 1999, Woodward, acting on behalf of DeBoer, sent a fax to Pappas regarding Klaas DeBoer's intentions with respect to providing equipment for Shaffer and the PGA tour on a tournament by tournament basis. (*Plaintiffs' Exhibit 44*). On January 4, 1999, Woodward sent a personal fax to Pappas suggesting the "style of reply" to the January 2 fax, (*Plaintiffs' Exhibit 45*). In other words, Woodward was advising Pappas as to how he should bargain with Woodward's current employer. Pappas testified that he did in fact use some of Woodward's suggestions.

On January 28, 1999, Shaffer, through Linda Truxell, made a presentation to representatives of the PGA Tour. Pappas was present at the meeting but Woodward was not. Pappas' notes, prepared for his presentation to the PGA representatives, reflect that DeBoer "declined to buy Shaffer" but agreed to supply equipment. (*Plaintiffs' Exhibit 50*). Pappas' notes conclude by stating that "Bill [Woodward] wants you to know he is very apologetic for DeBoer's actions in regard to Shaffer ... [a]nd he feels so strongly about it that he is resigning from DeBoer to live in the United States, run Shaffer and work with you [the PGA]." (*Id.*).

On February 28, 1999, Shaffer and the PGA executed the actual contract for tents to be used on the tour. (*Plaintiffs' Exhibit 52*). The efforts of Woodward were successful in that DeBoer was not a party to the agreement. The original bid proposal was submitted by *both* Shaffer and DeBoer. Woodward testified that he could obtain bank financing to purchase Shaffer only if the contract was let to Shaffer and not to DeBoer and Shaffer.

Shortly thereafter, on March 2, 1999, during a DeBoer International Sales meeting, Woodward informed Klaas DeBoer that he had purchased Shaffer for 7.5 million dollars. According to DeBoer, he was "flabbergasted" by Woodward's purchase of Shaffer. He did, however, prepare some calculations with respect to the 7.5 million dollar purchase price. (*Defendants' Exhibit 8*). DeBoer testified that while he did terminate Woodward on March 3, 1999, he wanted to maintain some form of a relationship with him in order for DeBoer to deal with the PGA.

On March 4, 1999, Pappas sent a letter to Klaas DeBoer informing him that "from all indications [Woodward] has the funds available to close the purchase once the agreement is signed. [Woodward] had an option until March 1, 1999 to close the purchase. He asked for an extension and we refused to do so. We want it closed." (*Defendants' Exhibit 9*). Pappas noted, however, that "as it was in the beginning, DeBoer is the best way for me to go. I don't have the date of the letter with me, but you refused to purchase early on because the contract was not issued and the stock was in question. Now both of these

items are a reality." (*Id.*). Pappas further noted that, until the papers were signed with Woodward, Shaffer was still for sale for ten million dollars. On March 5, 1999, Pappas faxed Shaffer's financial statements to DeBoer. (*Defendants' Exhibit 10*).

Klass DeBoer testified that, from July 1998 to March 1999, he had no contact with anyone at the PGA Tour about the sale of Shaffer; according to DeBoer, Woodward had been entrusted with negotiations in that regard.

On May 18, 1999, Klaas DeBoer congratulated Pappas on the sale of Shaffer Sports to Woodward and expressed enthusiasm for working with Shaffer and the PGA in the future. (*Defendants' Exhibit 13*).

## II.

█ The Court will first consider the Plaintiff's request for injunctive relief under Fed.R.Civ.P. 65. The United States Court of Appeals for the Sixth Circuit has identified four factors to assist the Court in determining whether such relief is appropriate. The analysis, which involves a weighing of the interests on both sides, requires consideration of the following: (1) whether there is a strong or substantial likelihood of the movant's success on the merits; (2) whether an injunction will save the movant from irreparable injury; (3) whether an injunction will harm others, including the non-movant; and (4) whether the public interest would be served by issuance of a preliminary injunction. *See e.g., International Longshoremen's Ass'n v. Norfolk Southern Corp.*, 927 F.2d 900, 903 (6th Cir.), *cert. denied*, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 38 (1991); *Sandison v. Michigan High School Athletic Assoc.*, 64 F.3d 1026, 1030 (6th Cir. 1995). These factors are meant to be balanced as they guide the Court in exercising its discretion; they are not due rigid application and need not be assigned equal weight. *In re Eagle–Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir.1992). While the Court need not consider any single factor as either indispensable or dispositive, neither is it required to conclude that all four support its decision. The Court's discretion is directed at the weight to be given each factor, and the effect to be accorded their mix. *Id.*

## A. Likelihood of Success on the Merits

### 1. Plaintiffs' Count I: Breach of Fiduciary Duty against Defendant Woodward

In their Amended Complaint, Plaintiffs allege that Woodward breached his fiduciary duties, including the duty of loyalty by:

i. Using and disclosing for his own benefit, Plaintiffs' proprietary and confidential information, including but not limited [to] the business and financial analyses relating to Plaintiffs' evaluation of Shaffer, which information Woodward obtained solely by, through, and as a result of his fiduciary relationship with Plaintiffs;

ii. Negotiating to purchase Shaffer for himself while Plaintiff's fiduciary;

iii. Competing against Plaintiffs for contracts with the PGA Tour while Plaintiffs' fiduciary;

iv. Undermining Plaintiffs' October 16, 1998 Letter of Agreement, contracts, and business expectancies with Shaffer and with the PGA Tour;

v. Disparaging and defaming Plaintiffs while Plaintiffs' fiduciary;

vi. Failing to disclose his self-dealing to Plaintiffs and otherwise making false representations to Plaintiffs to conceal his fiduciary breach;

vii. Failing to disclose to Plaintiffs his intent to purchase Shaffer; and

viii. Otherwise acting in direct conflict of interest with Plaintiffs.

*Amended Complaint* at ¶ 95.

■ This Court concludes that the evidence presented demonstrates an extremely high likelihood of success on this claim. Woodward's conduct in acquiring Shaffer while he was employed by DeBoer was of a particularly self-serving and egregious nature.

"Under Ohio law, a fiduciary relationship is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtues of this special trust." *Anchor v. O'Toole*, 94 F.3d 1014, 1023 (6th Cir.1996) (internal quotation marks and citation omitted). It is well-established that a corporate officer occupies a fiduciary relationship to his employer and that this relationship imposes upon the officer a number of duties, including "good faith, a duty of loyalty, a duty to refrain from self-dealing and a duty of disclosure." *Wing Leasing, Inc. v. M & B Aviation, Inc.*, 44 Ohio App.3d 178, 181, 542 N.E.2d 671 (1988). In considering whether the fiduciary has breached one or more of these duties, intent is not relevant; rather, "as long as the [fiduciary] places himself in a position of conflicting loyalties and subsequently violates his duty of trust and benefits at the expense of the corporation, liability attaches." *Ohio Drill & Tool Co. v. Johnson*, 625 F.2d 738, 742 (6th Cir.1980).

Plaintiffs argue that the burden in this case is on Defendant Woodward to establish that his actions were not in violation of his fiduciary duties. Plaintiffs rely upon *United States v. Skeddle*, 940 F.Supp. 1146 (N.D.Ohio 1996) in support of this theory. In that case, the defendants, corporate officers, were charged with mail fraud for their alleged self-dealing in regard to certain corporate transactions. The Court concluded that, under Ohio law, there is an inference of unfairness in the context of a self-dealing claim and, therefore, the burden of proving the fairness of a self-dealing transaction is on the fiduciary who benefitted from the transaction. *Id.* at 1151. Defendant Woodward contends that the claims at bar do not involve self-dealing so as to shift the burden of proof from the Plaintiffs.

■ The Court rejects Woodward's contention. The facts at bar clearly give rise to a claim of self-dealing. Woodward engaged in transactions on behalf of DeBoer, yet he failed to disclose the self-interest he would derive by his actions. Under Ohio law, the burden shifts to Woodward to establish that the transactions were fair to DeBoer. In light of the evidence presented, the Court finds it extremely unlikely that Woodward would have any success on this showing. On the contrary, the evidence presented clearly indicates that the transactions in which Woodward engaged were patently unfair to DeBoer. Although Woodward contends that DeBoer had no desire to purchase Shaffer outright, and the evidence indeed supports this contention, the fact remains that Woodward's actions operated to preclude DeBoer from achieving the sort of entry into the U.S. market and relationship with the PGA which it desired. Further, Woodward, for his own interest and contrary to that of DeBoer's, worked to keep DeBoer's name off of the PGA contract. Moreover, Woodward was keenly aware of DeBoer's expectations in this regard. The overwhelming evidence presented demonstrates that Woodward, in his capacity as International Sales Director for DeBoer, took advantage of his corporate position to engage in a transaction for his own benefit. Thus, the Court has little doubt concluding that Plaintiffs are likely to succeed on their claim of breach of fiduciary duty against Woodward.

### 2. Plaintiffs' Count II: Conspiracy to Breach Fiduciary Duties against Defendants Woodward, Shaffer, Truxell, Pappas and 21st Century

Plaintiffs allege that "[a]t all relevant times, Defendants knew that Woodward owed Plaintiffs fiduciary duties of trust, confidence, loyalty, full disclosure and good faith" but the Defendants "assisted Woodward in breaching his fiduciary duties and concealing Woodward's wrongful conduct from Plaintiffs." (*Amended Complaint* at ¶¶ 98–99).

■ In Ohio, civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Gosden v. Louis,* 116 Ohio App.3d 195, 219, 687 N.E.2d 481 (1996) (internal citations and quotations omitted). In order to succeed on a civil conspiracy claim, an underlying unlawful act must be shown. *Minarik v. Nagy,* 8 Ohio App.2d 194, 195, 193 N.E.2d 280 (1963). The requirement of malicious combination to injure "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden,* 116 Ohio App.3d at 219, 687 N.E.2d 481. In proving this element, " 'it is sufficient that the parties in any manner come to a mutual understanding that they will accomplish the unlawful design.' " *Id.,* quoting *Pumphrey v. Quillen,* 102 Ohio App. 173, 178, 141 N.E.2d 675 (1955). As to the element of malice, it is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Id.* at 219, 141 N.E.2d 675. The element of "in a way not competent for one alone" means that "if one person could lawfully commit an act, then the act committed by two or more persons cannot support a conspiracy claim." *Id.* at 220, 141 N.E.2d 675. In other words, a claim for civil conspiracy requires an underlying wrongful act.

■ As to the element of actual damages, "this simply restricts the measure of recovery for a conspiracy claim to those damages caused by the underlying tort (or torts) necessary to support the claim for civil conspiracy in the first place." *Id.* The Plaintiff need not show any damages above those that resulted from the underlying tortious conduct.

■ In this case, the Court concludes that Plaintiffs have demonstrated a strong likelihood of success on the merits of Count II as to Defendants Truxell and 21st Century. The evidence presented shows that Truxell was engaged in a common scheme with Woodward to further the breach of his fiduciary duties. This Court finds Truxell's conduct to be especially distasteful in light of her status as an attorney. Initially, all of the early information received by Truxell as to Shaffer came from Woodward's self-dealing, all of which was known to Truxell. For example, Truxell's January 1999 presentation to the PGA was clearly designed to deprive DeBoer of any direct relationship with the PGA and benefit Woodward and Truxell. In addition, Truxell was instrumental in forming the corporation through which she and Woodward acquired Shaffer. Truxell also advised Woodward knowing the legal duties he owed to DeBoer. Simply put, the evidence presented reflects that Truxell was engaged in a conspiracy to aid Woodward in the breach of his duties.

It follows from the Court's assessment of Woodward and Truxell's conduct that 21st Century, the "new company" formed to acquire Shaffer is equally culpable in the conspiracy to breach Woodward's fiduciary duties.

■ The Court is not prepared to reach the same conclusion with respect to Defendant Pappas at this juncture in the action. While it is clear that Pappas made no attempt to disclose to Klaas DeBoer that Woodward and Truxell desired to purchase his company, Pappas was under no obligation to do so. The evidence reflects that Pappas wanted to sell his company. The evidence also reflects that DeBoer wanted a pre-marriage type sale in which the company could be acquired after some time of business dealings. Pappas was, however, not amenable to such a proposal. While some evidence supports Plaintiffs' contention, the Court is not convinced that the evidence of record at this time establishes a likelihood of success on the claim that Pappas conspired to breach Woodward's fiduciary duties. The same is true with respect to Defendant Shaffer. These issues will, however, be revisited when this case is tried on the merits.

In sum, the Court concludes that Plaintiffs are likely to succeed on Count II as to Defendants Woodward, Truxell and 21st Century.

### 3. Plaintiffs' Count III: Fraud against Defendants Woodward, Shaffer and Pappas

Plaintiffs allege that Woodward breached his duty to speak to Plaintiffs by concealing the following:

i. His disclosure, for his own benefit, of Plaintiffs' proprietary and confidential information, including but not limited [to] the business and financial analyses relating to Plaintiffs' evaluation of Shaffer;

ii. His negotiations to purchase Shaffer for himself;

iii. His competition against Plaintiffs for contracts with the PGA Tour;

iv. His efforts to undermine Plaintiffs' October 16, 1998 Letter of Agreement, contracts, and business expectancies with Shaffer and with the PGA Tour;

v. His disparagement and defamation of Plaintiffs;

vi. His self-dealing; and

vii. His intent to purchase Shaffer.

(*Amended Complaint* at ¶ 103). Plaintiffs further allege that Woodward, Shaffer and Pappas

made the false statements to DeBoer, including those described above, to (1) induce DeBoer not to make a bid on the PGA Tour Contract for itself (rather than with Shaffer as joint venturer); (2) to induce DeBoer not to acquire Shaffer; and (3) to otherwise conceal Defendants' scheme to usurp Plaintiffs' opportunity to acquire Shaffer and to usurp Plaintiffs' relationship with the PGA Tour.

(*Id.* at ¶ 104).

[8] A cause of action for common law fraud requires a showing of the following: (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at issue; (3) made falsely with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge can be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance on the representation or concealment; and (6) injury proximately caused by the reliance. *Burr v. Board of Commissioners of Stark Co.*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986) (syllabus).

■ The Court concludes that Plaintiffs have a strong likelihood of success on their claim for fraud as to Defendant Woodward. The evidence presented shows that Woodward had a duty to disclose to DeBoer the nature of his involvement in the acquisition of Shaffer; that his involvement was material to DeBoer's desire to engage in a relationship with the PGA;

that Woodward acted with knowledge of the falsity of his representations to DeBoer regarding his involvement with Shaffer; that Woodward intended to mislead DeBoer into relying upon the false representations and concealment; that DeBoer in fact justifiably relied upon Woodward's representations; and that DeBoer suffered injury as a result of its reliance.

■■■ The Court concludes, however, that Plaintiffs have not demonstrated a strong likelihood of success on their claim for fraud as to Defendants Pappas and Shaffer. While it is clear that Pappas did not disclose to DeBoer that Woodward was personally interested in acquiring Shaffer, Pappas did not have a duty to make such a disclosure. Furthermore, the Court finds no evidence that Pappas made any materially false representation to DeBoer on which DeBoer relied. While the evidence indicates that Pappas was reluctant to lie to DeBoer, the evidence does not reflect an instance in which Pappas made a materially false representation sufficient to support a cause of action for fraud. Thus, the Court finds it unlikely that Plaintiffs will succeed on their fraud claim against Pappas. Similarly, Plaintiffs are unlikely to succeed on a claim for fraud against Shaffer. The Court nonetheless observes that these claims will be ultimately resolved when this case reaches trial.

### 4. Plaintiffs' Count IV: Conspiracy to Defraud against Woodward, Shaffer, Truxell, Pappas and 21st Century

Plaintiffs allege that the Defendants "assisted Woodward in defrauding Plaintiffs." (*Amended Complaint* at ¶ 107). As indicated above, a claim for civil conspiracy requires a showing of "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Gosden v. Louis, supra.*

■■■ The Court concludes that Plaintiffs have a strong likelihood of success on their claim for conspiracy to defraud as to Defendants Truxell and 21st Century. The Plaintiffs do not, however, have a strong likelihood of success as to Defendants Pappas and Shaffer. As indicated above, the evidence shows that Woodward's actions with respect to his acquisition of Shaffer were fraudulent. Furthermore, the evidence presented clearly demonstrates that Truxell was engaged in a common scheme with Woodward to further his fraudulent conduct. The documents presented show that Truxell and Woodward corresponded on numerous occasions regarding their acquisition of Shaffer and the need to keep the acquisition confidential. Furthermore, the evidence demonstrates that Truxell, herself an attorney, was aware of the potential liability to Woodward as a result of their scheme. Nonetheless, Truxell and Woodward carried out their plan to acquire Shaffer and usurp any direct relationship between DeBoer and the PGA. 21st Century Productions, the entity formed by Woodward and Truxell, is equally as culpable as Woodward and Truxell in the common scheme to defraud DeBoer.

■■■ The Court concludes, however, that the evidence presented fails to support Plaintiffs' claim that Pappas and Shaffer were engaged in a conspiracy to defraud DeBoer. Pappas clearly wanted to sell his company. As late as March 1999, Pappas informed DeBoer directly that if Woodward could not secure financing, Shaffer would remain for sale for ten million dollars. Furthermore, although Pappas was aware of Woodward and Truxell's plan, he expressed reluctance to lie to Klaas DeBoer. Pappas, the major American supplier for the PGA, was no doubt aware that because the PGA was desirous of DeBoer style tents, that maintaining a

good relationship with DeBoer was to his advantage. In sum, the Court concludes that, at this stage of the action, the evidence falls short of showing that Pappas and Shaffer conspired to defraud DeBoer. The Court also concludes that the Plaintiffs are very likely to succeed as this claim relates to the other Defendants.

## B. Irreparable Injury

The Court must next consider whether injunctive relief will save DeBoer from irreparable injury. Plaintiffs seek imposition of a constructive trust on Shaffer's stock and a freeze on revenues that Shaffer receives or has received from the PGA Tour until this case can be resolved on the merits. The Plaintiffs also seek appointment of a receiver to manage the operations of Shaffer.

The Court observes at the outset that Shaffer is in a much better financial position at this point than it was when this matter initially came to be heard in March 2001. Shaffer's success is undoubtedly attributable to the fact that Pappas has resumed oversight of the day-to-day affairs of the company, although Truxell and Woodward still maintain control of Shaffer stock. As the company's financial fortunes plummeted, Woodward and Truxell entered into an agreement with Pappas in which he took control of their stock until the end of this litigation. Truxell and Woodward have been dismissed as employees under Pappas' management. The Court recognizes Plaintiffs' desire to maintain the current status quo until this case can be tried on the merits.

In light of this Court's conclusion that Plaintiffs are likely to succeed on various aspects of their claims, the Court finds that maintaining the status quo of Shaffer is necessary to prevent irreparable injury. As past history reveals, if the company were to resume operation by Truxell and Woodward, there is a strong likelihood that these Defendants would engage in acts which would deprive Plaintiffs of a meaningful remedy. For this reason, the Court finds injunctive relief appropriate. The Court concludes, however, that a constructive trust, asset freeze and appointment of a receiver is not the most appropriate method to ensure that the status quo is maintained. Rather, the Court hereby ORDERS the following:

Mr. Pappas is ordered to continue the day-to-day operations of Shaffer. Shaffer is ordered to make monthly reports, through a Certified Public Accountant, to this Court of income and expenditures together with any substantial change in assets and liabilities. Mr. Pappas may engage in any ordinary business transactions and may engage in ordinary contract negotiations without Court approval. Anything outside of the ordinary course of business with regard to the purchase or sale of assets of any substantial amount will require prior Court approval. If there is any question as to what constitutes an "ordinary" transaction, Pappas is ordered to present the matter to the Court for prompt consideration. Mr. Pappas may continue to draw his usual salary. Any outstanding loans to Shaffer, particularly from Pappas, may have interest retired on a monthly basis, but no payment of principal may be made without prior Court approval. Any further infusion of new capital into the corporation must be reflected on the monthly reports and may be repaid. Any profits of the company above ordinary salaries and expenditures are to remain in one or more of Shaffer's corporate accounts and shall be reflected in the monthly reports. Defendants Woodward and Truxell are ordered to maintain ownership of their stock but they are not to engage in *any* way in the operation of Shaffer's business and may not sell any stock in the company without prior Court approval. With respect to attorneys' fees payable by

Shaffer, the parties are ordered to submit an application to the Court. The gross amount shall be exchanged with counsel, while full invoices with time descriptions shall be submitted only to the Court for *in camera* inspection. No attorneys fees shall be paid without prior Court approval.

In sum, the Court finds that the imposition of the foregoing injunctive relief will save Plaintiffs from irreparable injury until this case can be tried on the merits.

## C. Harm to Others

The Court concludes that the foregoing relief will not be harmful to others, in particular the Defendants. As stated in open-court, Mr. Pappas has agreed to run Shaffer until this case is resolved. The relief imposed with insure that Shaffer maintains its current productive status, which clearly is in the parties' as well as the PGA's best interests.

## D. Public Interest

Finally, the Court concludes that the public interest is furthered by the imposition of injunctive relief. The conduct in which Woodward and Truxell were engaged is clearly contrary to the expectations of those who rely on fiduciaries to conduct their business transactions. Maintenance of the status quo until this case can be tried will serve the public's interest in ensuring that those who breach fiduciary duties and those who aid in such actions will be held accountable.

## III.

The Court next considers Plaintiffs' Motion pursuant to Fed.R.Civ.P. 66 for Appointment of a Receiver. Plaintiffs argue that appointment of a receiver is warranted because of the nature of Defendants' wrongful conduct.

Rule 66 provides:

An action wherein a receiver has been appointed shall not be dismissed except by order of the court. The practice in the administration of estates by receivers or by other similar officers appointed by the court shall be in accordance with the practice heretofore followed in the courts of the United States or as provided in rules promulgated by the district courts. In all other respects the action in which the appointment of a receiver is sought or which is brought by or against a receiver is governed by these rules.

Fed.R.Civ.P. 66.

■■■ This Court observes that, while appointment of a receiver is in the Court's discretion, it is "an extraordinary remedy that is only justified in extreme situations." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.,* 999 F.2d 314, 316 (8th Cir. 1993). There is no precise formula for determining when appointment is warranted; however, courts generally consider the validity of the claim by the party seeking appointment; the probability that fraudulent conduct has occurred or will occur to frustrate the claim; imminent danger that property will be concealed, lost or its value diminished; inadequacy of legal remedies; lack of less drastic equitable remedy; and the likelihood that appointment will do more good than harm. *Id.* at 316–17 (citations omitted); *see also Macon Lumber v. Bishop and Collins,* 229 F.2d 305, 306 (6th Cir.1956)(holding that appointment of a receiver over a solvent company is only justified to prevent fraud or to save property from irreparable injury or threatened loss of destruction).

■■■ Although this Court has concluded that Woodward and Truxell were engaged in conduct that is highly probable to be found fraudulent, the Court finds that, in light of the fact that Shaffer has been solvent and productive under Pappas' oversight, appointment of a receiver is unnecessary at this time. The Court con-

cludes that the injunctive relief ordered above is a more appropriate remedy to maintain the status quo until this case can be tried on the merits on June 10, 2002.

The Court notes that any failure to comply with the Order herein imposed will result in this Court appointing a receiver. At this juncture, however, Plaintiffs' motion under Rule 66 is denied.

## IV.

In light of the foregoing, Plaintiffs' Motions under Rule 65 for Preliminary Injunction and Imposition of a Constructive Trust and under Rule 66 for Appointment of a Receiver (**Doc. # 2 and # 35**) **are GRANTED in part and DENIED in part** to the extent set forth above.

The parties are **ORDERED** to comply with the terms of the Preliminary Injunction imposed in this Opinion and Order.

**IT IS SO ORDERED**.