NACCO MATERIALS HANDLING GROUP, INC., d/b/a Yale Materials Handling Corporation, Plaintiff,

v.

TOYOTA MATERIALS HANDLING USA, INC., and The Lilly Company, Defendants.

No. 03–2561 BA.

United States District Court, W.D. Tennessee, Western Division.

Nov. 23, 2004.

J. S. Wilson, III, Glen G. Reid, Jr., Memphis, TN, for Plaintiff.

Aubrey B. Harwell, Jr., Jon D. Ross, Ronald G. Harris, Nashville, TN, Mark S. Norris, Amy Holliman Brown, Jeff Smith, Memphis, TN, for Defendants.

ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE PLAINTIFF'S SUPPLEMENTAL POST HEARING BRIEF, DEFENDANT'S MOTION TO CONSIDER POST HEARING FACTS, DEFENDANT'S MOTION TO STRIKE THE AFFIDAVIT OF WILLIAM PFLEGER, AND DEFENDANT'S APPLICATION FOR A PRELIMINARY INJUNCTION

BREEN, District Judge.

This case involves claims by Plaintiff, NACCO Materials Handling Group, Inc. doing business as Yale Materials Handling Corporation ("Yale"), against Defendant Toyota Materials Handling USA, Inc. ("Toyota"), for unlawful procurement of breach of contract in violation of Tennessee Code Annotated § 47–50–109 (2001) and for a declaratory judgment against Defendant The Lilly Company ("Lilly") finding that two dealership contracts be-tween Yale and Lilly terminated based upon Lilly's breach. Approximately two weeks after the complaint was filed, Lilly presented an application for a preliminary injunction asking the Court to enjoin the Plaintiff from terminating the dealership contracts. Currently before the Court is Lilly's application for a preliminary injunction and several related motions.

## BACKGROUND

Yale, as an operating division of NACCO, manufactures and supplies lift trucks, also called forklift trucks, and related products to retailers for resale to businesses or individuals in need of heavy-duty equipment commonly used for moving inventory throughout a warehouse. Lilly is a retailer which resells and services lift trucks in parts of Tennessee, Mississippi, and Arkansas. For the past fifty years, Yale has had a supplier relationship with Lilly. In 1992, the Plaintiff redrafted its dealer contracts to include an exclusivity clause, which prohibited its dealers from selling or promoting any products that compete with Yale. On July 2, 2002, Plaintiff and Defendant Lilly renewed their contractual relationship and entered into two Dealer Marketing Agreements, which are the subject of this dispute.

Agreement 062 grants Lilly the exclusive right for three years to sell and service Yale products in Memphis, Tennessee, northern Mississippi, and western Arkansas (hereinafter "Memphis Agreement"). (Transcript of Proceedings at 64 ("Tr. at ___").) The other agreement, Agreement 050, gives Lilly the same three year term for the middle Tennessee area, including Nashville (hereinafter "Nashville Agreement"). (Tr. at 68.) Included in both agreements is Section 3.15 which provides that the "[d]ealer agrees not to sell or offer for sale during the term of the Marketing Agreement new equipment which

competes directly with Yale Products." (Answer Am. Compl. Counter Compl. Ex. A & B.) Section 3.14 [1] of the marketing agreements contains a "good will" provision and a "business ethics" provision requiring the dealer to "actively develop, preserve and promote the goodwill and reputation of Yale, its goods and services and [to] exercise commercial good faith and honesty in its business dealings with Yale and third parties." [2]

In the Spring and Summer of 2003, the relationship between the parties began to deteriorate. During that time period, a dealer for Toyota in Memphis, Tennessee was being terminated due to questionable business practices. Toyota began talking to Lilly about becoming a dealer for it in the Memphis area, although the exact date when Lilly began seriously considering Toyota's offer is disputed. Thomas Clark, III, the president of Lilly, testified at the preliminary injunction hearing that on May 5, 2003 he first met the officers of Toyota in San Antonio at a material handling convention. (Tr. at 71.) Clark stated that he was approached by Toyota on June 24, 2003 regarding the possibility of replacing the current Toyota dealer in Tennessee. (Tr. at 72.) On July 9, 2003, Lilly entered into a non-binding letter of intent with Toyota to become its dealer in the Memphis area. (Tr. at 73.) Conversely, John Levine, a vice president of counter balance sales for Yale, testified that "rumors" began to circulate in March 2003 about Lilly's plan to become a Toyota dealer and alleged that Lilly had been dishonest about its intentions. (Tr. at 148.) Levine stated that he asked Craig Avery, chief operating officer for Lilly, on July 3, 2003 "point blank" whether Lilly was trying to become a Toyota dealer to which Avery answered that he was not doing anything with Toyota. (Tr. at 150–51.) Levine claimed that Avery's answer was substantially the same on July 7, 2003. (Tr. at 152–53.) On July 15, Levine asserts that Avery finally told him that Lilly was merely buying a Toyota dealership to convert to a Yale dealership but stated that nothing had been signed between them. (Tr. at 153–55.)

Lilly had its final meeting with Yale on July 21, 2003 where Colin Wilson, president of NACCO for the Americas, and Don Chance, president of Yale, allegedly threatened to terminate both the Memphis and Nashville Dealer Agreements and to initiate litigation against Lilly and Toyota as well as Lilly's officers if Lilly decided to represent Toyota. (Tr. at 78–83.) On July 24, 2003, Toyota agreed to indemnify Lilly for litigation expenses related to any legal action which Yale might take if Lilly became a dealer for Toyota. (Tr. at 105.) Several days later, Lilly's board of directors met and decided to proceed with the Toyota arrangement. (Tr. at 88.) On August 1, 2003, Lilly received a letter from Yale terminating the Memphis and Nashville agreements for violating Section 3.15 of the agreements.

Yale submits that Lilly's motive for seeking to become a Toyota dealer was to regain Federal Express, a Memphis-based corporation, as a client. In the past, Federal Express used Yale forklifts, and Lilly

---

**1.** Section 3.4 of the agreements contains similar language to Section 3.14. Section 3.4 requires Lilly to engage in "actively and effectively soliciting and promoting on a regular and frequent basis all usual and potential customers in the Management unit ...." (Answer Am. Compl. Counter–Compl. Ex. A & B.)

**2.** The agreements also include trade mark licensing provisions; however, the Plaintiff has stated that these provisions are not to be considered for purposes of ruling on the preliminary injunction. (Tr. at 25.)

serviced the account which resulted in significant revenue for Lilly. (Tr. at 125.) However, Federal Express opted to use Toyota for its material handling needs and thus, ceased its dealings with Lilly. The Plaintiff's claim that Lilly was seeking to regain the Federal Express account was rebutted by Craig Avery who testified that although the Federal Express business had produced significant revenue in the past, Lilly's parts and service business had become a large part of its present revenue production, with Federal Express only adding marginal revenue. (Tr. at 125–28.) Thus, Avery claimed that regaining the Federal Express business was not a motivating factor in Lilly's discussions with Toyota. (Tr. at 127.)

On July 29, 2003, Yale filed a complaint in Shelby County, Tennessee Circuit Court against Toyota and Lilly. The Defendants removed the action to this Court based on diversity of citizenship. *See* 28 U.S.C. § 1331. Thereafter, Lilly filed its application for a preliminary injunction on which a hearing was conducted. The parties subsequently attempted to resolve their disputes through private mediation, which proved unsuccessful.

The primary issue before the Court is whether Lilly's request for an injunction preventing Yale from terminating the dealership agreements should be granted. Other ancillary issues were presented at the preliminary injunction hearing including whether the Nashville agreement should be affected by Lilly's action taken in Memphis and whether Tennessee Code Annotated § 47–25–1311(b), governing the rights of dealers against suppliers, changes the preliminary injunction standard under Rule 65, Federal Rule of Civil Procedure.

After the hearing, Yale filed a supplemental post hearing brief to which Lilly and Toyota filed motions to strike. Thereafter, Lilly submitted a motion to consider post-hearing facts which allegedly differed from the testimony of one of Yale's witnesses at the hearing. Approximately five months later, Yale filed a renewed motion for a status conference and attached the affidavit of William Pfleger. Lilly submitted a motion to strike the Pfleger affidavit. The Court will first consider Lilly's and Toyota's motions to strike Yale's supplemental post hearing brief and then examine Lilly's motion to consider post-hearing facts. Next, the Court will consider Lilly's motion to strike the second affidavit of William Pfleger. Finally, the Court will address the issues with respect to the issuance of a preliminary injunction.

## ANALYSIS

### I. Yale's Supplemental Post Hearing Brief.

Yale's supplemental brief included the affidavit of Pfleger and Lilly's financial statements for the fiscal year ending on September 30, 2003. As a director of dealer development for the Plaintiff, Pfleger reviews its dealers' certified and audited financial statements for each fiscal year. He attested that in the Defendant's financial statements, the auditors for Lilly state that "any liability resulting from an adverse determination of this litigation [between Yale and Lilly] would not have a material adverse effect on the Company's financial condition or results of operations." (Supp. Post Hr'g Br. at 1–2; Affidavit of William Pfleger at 2; Lilly's September 2002–2003 Financial Statement at 14.) Therefore, Plaintiff argues that Lilly's financial statement establishes that it cannot prove irreparable harm.

Lilly, as well as Toyota, filed a motion to strike Yale's brief, arguing that the Plaintiff has taken the note on the financial statement out of context. (Lilly Co.'s Reply Mot. Strike Yale's Supplemental Post

Hr'g Br. at 1.) In support of its position, Lilly presents the affidavit of Carl J. Haag, the certified public accountant who actually prepared the note. Haag insists that the intent of the statement "is to convey the belief of Lilly's management that any obligation to pay a judgment would not be sufficient to have a material adverse effect on the Company's financial condition." (Affidavit of Craig J. Haag at 2.) Haag further submits that the "disclosure in Note 12 was not intended to and should not be construed as containing any forecast by Lilly's management of the effect of any subsequent termination of Lilly as an authorized dealer by Yale on Lilly's financial condition or results of operations." (Haag aff. at 2.) Thus, Lilly argues that the statements in Yale's brief and affidavit of Pfleger are irrelevant and should not be considered. (Lilly Co.'s Reply Mot. Strike Yale's Supplemental Post Hr'g Br. at 3.)

■ Granting or denying a motion to strike is within the sound discretion of the district court. *Federal Deposit Insurance Corp. v. Butcher,* 660 F.Supp. 1274, 1277 (E.D.Tenn.1987); *see also Royal Surplus Lines Ins. Co. v. Sofamor Danek Group,* 190 F.R.D. 463, 480–81 (W.D.Tenn.1999) (stating "it is within the court's discretion to entertain additional proof or legal arguments" when deciding a motion before the court). The Court GRANTS Lilly's and Toyota's motions to strike Plaintiff's post hearing brief because the brief and statements contained therein are not relevant to the preliminary injunction motion. The affidavit of Haag, the author of the financial statement note, is particularly persuasive and points out that the note has little relationship with the potentially irreparable harm that Lilly could suffer if Yale is allowed to terminate the dealership agreement. (Haag aff. at 2.)

## II. Lilly's Motion to Consider Post Hearing Facts.

On February 19, 2004, Lilly filed a motion to consider post-hearing facts which allegedly contradict the testimony presented at the preliminary injunction hearing by Yale. At the hearing, Yale presented the testimony of William Pfleger who stated that "our Yale dealers sell to competitive dealers in their marketplaces on a regular basis." (Tr. at 249.) Shortly after the hearing, NACCO issued a memorandum to all of its dealers implementing a policy which expressly prohibited all Yale dealers from selling Yale parts to a non-Yale dealer. (Lilly Co.'s Mot. Mem. Consider Post–Hr'g Facts at 1.) The memorandum states in part that

> [s]ale of Yale and Premier Parts to third parties for resale, whether within or outside the dealers' management unit is strictly disallowed. Unauthorized wholesaling of Yale and Premier Parts, Sales by Dealer of Yale and Premier Parts to non-end users or sales of Yale and Premier Parts to end-users outside Dealer's management unit will result in dealer's disqualification from then current rebate or other marketing incentives offered by Yale, loss of parts return privileges, prompt payment discounts, "Power Buyer" rebates and such other programs as Yale may determine, in its sole discretion.

(Lilly Co.'s Mot. Mem. Consider Post–Hr'g Facts Ex. C.) In response, Plaintiff argues that the policy is not new or different from the testimony given by Pfleger at the preliminary injunction hearing and does not prohibit a Yale dealer from selling Yale parts to a non-Yale dealer. (Resp. Lilly Co.'s Mot. Consider Post–Hr'g Facts at 1.) Yale points to Pfleger's testimony at the hearing where he stated that Yale Carolina, a Yale dealer, could offer Lilly discounted Yale prices but that such transac-

tions may have adverse implications with respect to Yale Carolina's ability to participate in some marketing programs. (Resp. Lilly Co.'s Mot. Consider Post–Hr'g Facts at 3.)

Although Yale argues that the memorandum is not a change in policy, the memorandum explicitly states "[s]ale of Yale and Premier Parts to third parties for resale, whether within or outside the dealers' management unit is strictly disallowed." The Court finds this difference to be a material change because the evidence adduced at the preliminary injunction hearing stated the opposite, that selling Yale parts to non-Yale dealers was allowed, not "strictly disallowed." Thus, because these facts bear on the testimony given by the parties at trial, the Court GRANTS Lilly's motion to consider the post hearing facts.

### III. Lilly's Motion to Strike the Affidavit of William Pfleger.

On July 13, 2004, Yale filed a Renewed Request for Status Conference and attached to it a second affidavit of William Pfleger. Yale's stated purpose in filing the motion was that private mediation had been unsuccessful in resolving the dispute between the parties and that Pfleger's affidavit demonstrates that Yale is being irreparably harmed by the delay in this matter. (Renewed Req. Status Conference at 1–2.) However, in its request, the Plaintiff does not ask the Court to consider any post-hearing evidence. Lilly filed a Motion to Strike the Affidavit of William Pfleger, arguing that Yale was attempting to supplement the record long after proof had been closed by filing the affidavit along with a motion unopposed by Lilly. Since Yale submitted the affidavit with its renewed motion for a status conference and asserted that the affidavit demonstrated irreparable harm to Yale due to delay while trying to mediate the dispute, the

affidavit will not be considered for purposes of the injunction. Yale has not sought to have the Court consider the affidavit for purposes of the preliminary injunction. Therefore, Lilly Motion to Strike the Affidavit of William Pfleger for purposes of ruling on the preliminary injunction is GRANTED.

### IV. Lilly's Application for a Preliminary Injunction.

In their briefs as well as at the hearing, the parties raised several issues for the Court to consider when determining whether to issue a preliminary injunction. The Court will first address whether the Nashville and Memphis agreements are two separate agreements and whether action taken under one should impact the other. Second, the Court will address the Defendant's argument that the Tennessee statutes applicable to this action change the standard for determining whether to grant or deny a request for a preliminary injunction. Last, the Court will determine whether a preliminary injunction should be issued.

#### A. Nashville and Memphis Agreements.

█ Plaintiff seeks to have the Nashville and Memphis agreements terminated because it contends that Lilly has violated both agreements by negotiating with Toyota to become a dealer in Memphis. Lilly argues that the Nashville agreement is a separate and distinct contract as the two agreements have different market share requirements and contain clauses providing that each document "constitutes the entire agreement between the parties on the subject matter hereof." (Application Prelim. Inj. at 11 & Ex. A and B.) Based on this language, Lilly argues that a default under the Memphis agreement, if any, would not permit Yale to terminate

the Nashville agreement. (Application Prelim. Inj. at 11.) Conversely, Yale maintains that Lilly, if allowed to represent Toyota in Memphis and Yale in Nashville, could misappropriate Yale's trade secrets as well as highly confidential information about pricing and competition strategies. (Yale's Prelim. Inj. Hr'g Br. at 21.) Yale primarily relies on *Honda Research and Development Co., Ltd. v. Loveall,* 687 F.Supp. 355, 355–56 (E.D.Tenn.1985), which it contends establishes that the "resultant harm to Yale is irreparable as a matter of law." (Yale's Prelim. Inj. Hr'g Br. at 21.) In *Honda,* the court issued a preliminary injunction to prevent the disclosure of copyrighted confidential research information. This Court does not read the case as establishing irreparable harm as a matter of law in this case, but instead finds *Honda* distinguishable. In *Honda,* irreparable harm was found likely if the defendant was allowed to disclose plaintiff's confidential copyrighted research. *Honda Research and Development Co.,* 687 F.Supp. at 356. Obviously, no copyright infringement is before the Court here. Instead, Yale had the two agreements executed separately and both included integration clauses drafted by Yale. (Tr. at 68.) There is no evidence before the Court which would cause it to conclude that finding a breach of the Memphis agreement would necessitate a termination of the Nashville contract. Therefore, for purposes of the preliminary injunction, Yale is ENJOINED from terminating the Nashville agreement.

### B. Standard for Preliminary Injunction in Light of Tennessee Statute.

■ At the hearing and in its briefs, Lilly submitted that when injunctive relief is explicitly authorized by statute, proper

exercise of discretion requires issuance of the injunction if "(1) there has been a violation of the statute; and (2) granting the injunction would fulfill the legislative purpose behind the statute's enactment." (Pre–Hr'g Br. Lilly Co. at 7.) Tennessee Code Annotated § 47–25–1311(b), upon which Lilly bases its position, states that a "retailer shall be entitled to injunctive relief against unlawful termination, cancellation, nonrenewal or substantial change of competitive circumstances of the retail agreement." Tenn.Code Ann. § 47–25–1311(b)(2001). Lilly relies primarily on *United States v. White* in which the court stated that " '[w]hen an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose.' " *United States v. White,* 769 F.2d 511, 515 (8th Cir.1985) (citations omitted). However, Yale argues that the relevant statute in *White* was a federal statute, not a state statute, and that a Tennessee statute cannot change the federal procedural preliminary injunction standard. (Yale's Prelim. Inj. Hr'g Br. at 14.) In support of its position, Yale points to *Dairymen, Inc. v. D.T. Hardin,* in which the court held that a Tennessee statute which states "shall be entitled to a ... preliminary injunction" did not modify the requirements of notice, hearing, or the "usual equitable principles applicable to the granting of preliminary injunctive relief." *Dairymen, Inc. v. D.T. Hardin,* 369 F.Supp. 1102, 1104 (E.D.Tenn.1974). Similarly, in *Warren Corp. v. Goldwert Textile Sales, Inc.,* 581 F.Supp. 897, 901 (S.D.N.Y.1984), the court found that the Lanham Act,[3] Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.,* does not change the standard for determining

---

**3.** Included in the Lanham Act is 15 U.S.C. § 1114(2) which states that a trademark owner "shall be entitled as against such infringer ... to an injunction."

whether to issue an injunction. *See also Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983). The Court finds that § 47–25–1311(b) does not alter the standard for determining whether a preliminary injunction should be issued but merely expresses the Tennessee legislature's intent. *See Dairymen, Inc.*, 369 F.Supp. at 1104; *Warren Corp.*, 581 F.Supp. at 901. This interpretation is consistent with *White* which states that discretion usually requires issuance of an injunction "if the prerequisites" have been demonstrated. *See White*, 769 F.2d at 515. If the prerequisites for an injunction have been established, this Court would issue the injunction even in the absence of a statute. The statute may be more appropriately considered as a factor under the public interest prong of the injunction analysis. *See Vanadium Corp. of Am. v. The Susquehanna Corp.*, 203 F.Supp. 686, 696 (D.Del.1962) (stating that the court is aware of the public interest to guard against violations of statutes).

### C. Whether Issuance of a Preliminary Injunction is Appropriate.

■ In ruling on a preliminary injunction under Federal Rule of Civil Procedure 65, a court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Rock and Roll Hall of Fame and Museum v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir.1998). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir.2003). "While the Court need not consider any single factor as either indispensable or dispositive, neither is it required to conclude that all four support its decision." *De Boer Structures (U.S.A.) Inc. v. Shaffer Tent and Awning Co.*, 187 F.Supp.2d 910, 919 (S.D.Ohio 2001). "The Court's discretion is directed at the weight to be given each factor, and the effect to be accorded their mix." *Id.* (citing *In re Eagle–Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir.1992)).

### 1. Likelihood of success on the merits.

To properly determine whether Lilly might succeed on the merits, the Court must examine the Tennessee statutory law applicable to this dispute.[4] Tennessee Code Annotated § 47–25–1302 states that "[n]o supplier, directly or through an officer, agent or employee, may terminate, cancel, fail to renew or substantially

---

4. The parties do not appear to dispute that Tennessee Code Annotated § 47–25–1301, *et seq.*, applies to this dispute. Under the statutory scheme, a "retailer" is defined as "any person, firm or corporation engaged in the business of selling and retailing farm implements and machinery, construction, utility and industrial equipment, outdoor power equipment, attachments of repair parts and shall not include retailers of petroleum products." Tenn.Code Ann. § 47–25–1301(4). Lilly is a "retailer" as defined by § 47–25–1301(4) because it engages in selling and retailing industrial equipment, which although not defined in the statute, clearly includes lift trucks which fall within the plain meaning of the term. *See Stanton v. City of Battle Creek*, 466 Mich. 611, 647 N.W.2d 508, 512 (2002) (describing a forklift as a "piece of industrial equipment"). The definition of a "supplier" includes "any manufacturer, wholesaler, wholesale distributor, or any purchaser of assets or stock of any surviving corporation resulting from a merger or liquidation, any receiver or assignee, or any trustee of the original manufacturer, wholesaler or distributor." Tenn.Code Ann. § 47–25–1301(6). Likewise, Yale as a manufacturer and supplier of lift trucks falls within the plain meaning of "supplier."

change the competitive circumstances of a retail agreement without good cause." Tenn.Code Ann. § 47–25–1302(a). "Good cause" is defined as a "failure by a retailer to comply with requirements imposed upon the retailer by the retail agreement if such requirements are not different from those imposed on other retailers similarly situated in this state." Tenn.Code Ann. § 47–25–1302(a). A supplier is required to provide written notice stating all reasons which constitute good cause for termination to a retailer and provide the retailer at least ninety days to cure the deficiency. Tenn.Code Ann. § 47–25–1302(b). Additionally, a supplier may not "[c]oerce a retailer into refusing to purchase equipment manufactured by another supplier." Tenn.Code Ann. § 47–25–1304. "Any contractual term restricting the procedural or substantive rights of a retailer under this part, including a choice of law or choice of forum clause, is void." Tenn.Code Ann. § 47–25–1312. Moreover, "[t]he provisions of this part shall not be waivable in any contract, and any such attempted waiver shall be null and void." Tenn.Code Ann. § 47–25–1313.

Yale argued that it had good cause to terminate the agreement under § 47–25–1302(a) because of Lilly's failure to comply with Section 3.15 in the contract which requires Lilly to sell Yale products exclusively. (Yale's Prelim. Inj. Hr'g Br. at 23.) The Plaintiff also contended that it had not "coerced" the Defendant but that Lilly "voluntarily agreed" to be subject to the provisions in question. (Yale's Prelim. Inj. Hr'g Br. at 25.) Due to the absence of Tennessee case law interpreting "coercion" in § 47–25–1304, Yale cites cases interpreting the federal Automobile Dealers' Day in Court Act which also contains a prohibition against "coercion." *See* 15 U.S.C. § 1221(e) (stating "good faith" is freedom from coercion). Yale primarily relies on *Cecil Corley Motor Co. v. General*

*Motors Corp.*, 380 F.Supp. 819, 844 (M.D.Tenn.1974), in which the court, interpreting the Automobile Act, held it was not unlawful coercion for a supplier to require a dealer to comply with the terms of its contract because "otherwise the manufacturer would be precluded from insisting upon reasonable and valid contractual provisions." *See also Woodard v. General Motors Corp.*, 298 F.2d 121, 128 (5th Cir. 1962) (holding that the prohibitions under the statute do not "prevent[ ] a manufacturer from terminating a contract with a dealer where the dealer has, over a long period of time, violated a valid and material clause of the contract and [has] failed to comply with the continuing insistence of the manufacturer upon performance"). With regard to the anti-waiver provision contained in § 47–25–1313, Yale maintains it has not violated that section because the Defendant did not waive its statutory right but voluntarily agreed without coercion to be subject to the exclusivity provision. (Yale's Prelim. Inj. Hr'g Br. at 28.)

Lilly counters by claiming that Yale "coerced" it not to purchase equipment from Toyota by threatening litigation against Lilly, threatening to sue its officers personally, and threatening termination of both the Memphis and Nashville agreements. (Pre–Hr'g Br. Lilly Co. at 12.) The Defendant maintains that if the Court accepts Yale's argument that "coercion" can only be used when the agreement is being entered into then such an interpretation would read the Tennessee statute's anti-waiver provision out of the law. (Closing Br. Lilly Co. at 5–7.) Again, because Tennessee courts have not addressed these issues, Lilly cites to several cases from other jurisdictions which have similar dealer protection laws. In *Minnesota Supply Co. v. The Raymond Co.*, No. 99–832 at 12–13 (D. Minn. Memorandum Opinion and Order, September 26, 2003

(attached to Appendix of Pre–Hr'g Br. Lilly Co.)), the court held that Minnesota's dealer protection statute [5] voided "exclusivity" clauses which were included in the dealer agreement and found the supplier had used those clauses to coerce the plaintiff into signing the agreement. Lilly also points to *Midwest Great Dane Trailers, Inc. v. Great Dane Ltd. P'ship*, 977 F.Supp. 1386, 1392 (D.Minn.1997) in which the court held that a claim existed for violation of the Minnesota statute even if the alleged violation was contractually permissible. *See also Jungbluth v. Hometown, Inc.*, 201 Wis.2d 320, 548 N.W.2d 519, 523 (1996) (stating that "the legislature sought to protect a dealer from the unscrupulous inclusion of overreaching provisions within a dealership agreement" by Wisconsin Statute § 135.025(3) [6] which states that the effect of this chapter cannot be varied by contract).

 The Tennessee statutes applicable to this dispute similarly provide protection for dealers such as Lilly. *See e.g., Power & Telephone Supply Co., Inc. v. Harmonic Inc.*, 268 F.Supp.2d 981, 987 (W.D.Tenn.2003) ("The Court can conceive of no clearer statement [in Tenn.Code Ann. § 47–25–1301, *et seq.*] of a fundamental policy of Tennessee to protect such retailers than the statutory enactment invalidating contractual choice of law provisions and requiring the parties to comply with Tennessee law."). Section 47–25–1304 states that a supplier shall not "coerce a retailer into refusing to purchase equipment manufactured by another supplier." When interpreting a statute, if the language within the four corners of the statute is unambiguous, "the legislative intent must be derived from the statute's face." *Bryant v. Genco Stamping & Mfg. Co.*, 33 S.W.3d 761, 765 (Tenn.2000). When a statute is unclear, the court must ascertain the legislature's intent, and in so doing, must "look to the entire statute in order to avoid any forced or subtle construction of the pertinent language." *Lyons v. Rasar*, 872 S.W.2d 895, 897 (Tenn.1994) (citing *McClain v. Henry I. Siegel Co.*, 834 S.W.2d 295 (Tenn.1992)). Section 47–25–1304 does not define what behavior "coerce" includes, and consequently, the statute seemingly is ambiguous. Although Yale maintains that it can only "coerce" Lilly under the statute when the agreement is being entered into, such a construction of the statute would seem to leave § 47–25–1313 with no effect. Section 47–25–1313 explicitly provides that the rights under the statute, including the right to be free from being coerced into refusing to purchase equipment manufactured by another supplier, "shall not be waivable in any contract, and any such attempted waiver shall be null and void." Tenn.Code Ann. § 47–25–1313. Interpreting the statute as a whole, the Court finds the Tennessee legislature intended to prohibit coercion at the time of signing the contract and any time thereafter since the right to be free from such coercion cannot be waived. *See Lyons*, 872 S.W.2d at 897.

---

**5.** Similar to Tennessee's statute, Minnesota's Heavy and Utility Equipment Manufacturers and Dealers Act states that "[i]t is a violation of [state law] for an equipment manufacturer to ... coerce an equipment dealer into a refusal to purchase the equipment manufactured by another equipment manufacturer ...." Minn.Stat. Ann. § 325E.0682 (2004). Furthermore, "[a] term of a dealership agreement ... that is inconsistent with the terms of [state law] or that purports to waive an equipment manufacturer's compliance with [state law] is void and unenforceable and does not waive any rights that are provided to a person by [state law]." Minn.Stat. Ann. § 325E.0683 (2004).

**6.** Also comparable to Tennessee law is Wisconsin's Fair Dealership Law, Wis. Stat. § 135.01 *et seq.*

Additionally, the statutory language does not limit the prohibition against coercion only to the point of the execution of an agreement. *See* Tenn.Code Ann. § 47–25–1304. Yale's conduct in threatening to sue Lilly's officers and to terminate the Memphis and Nashville agreements is coercive conduct because Yale is seeking to restrain Lilly's unwaivable right to purchase equipment from another supplier by such threats. Such an interpretation of the statute comports with the ordinary meaning of the term "coerce" defined as "to restrain or dominate by force ... or threat." Webster's Collegiate Dictionary 222 (10th ed.1993). Additionally, the Court is unpersuaded by Yale's argument under *Cecil Corley* because that court only held that it is not coercion to enforce a valid provision, unlike the case here where the statute expressly makes the prohibited provision invalid and not subject to waiver. *See Cecil Corley*, 380 F.Supp. at 843 (interpreting 15 U.S.C. § 1221). Therefore, for purposes of the preliminary injunction, Lilly has a strong likelihood of success in preventing Yale from terminating the Memphis Agreement based on the exclusivity provision in Section 3.15.

Since the exclusivity section in the Memphis Agreement cannot constitute good cause to terminate the agreement, Yale must provide a basis under some other provision. The Plaintiff also seeks to terminate the agreement based on Lilly's alleged violation of the "best efforts" and "business ethics" provisions of Section 3.14, which require Lilly to "actively develop, preserve and promote the goodwill and reputation of Yale, its goods and services and ... exercise commercial good faith and honesty in its business dealings with Yale." (Yale's Prelim. Inj. Hr'g Br. at 6.) The Plaintiff insists that Lilly cannot represent Yale with its best efforts if it also represents Toyota. (Yale's Prelim. Inj. Hr'g Br. at 23.) Yale relies on *Joyce Beverages of N.Y., Inc. v. Royal Crown Cola Co.*, 555 F.Supp. 271, 275 (S.D.N.Y. 1983) which held acceptance of a competitive license and franchise "legally breaches [plaintiff's] obligation to devote its 'best efforts' to handle and expand [defendant's] sales." However, Yale did not present any evidence at the preliminary injunction hearing or submit post-hearing facts which might establish that Lilly is not using its "best efforts" to promote the sale of Yale products. Indeed, the evidence at the hearing showed that Lilly's market share representing Yale in the Memphis market was 17% while Yale's national market share was only 14%. (Tr. at 229.)

With respect to the "business ethics" requirement, the evidence was disputed as to when Lilly began seriously considering Toyota's offer. Yale presented statements by its officers that rumors began to circulate about Lilly's dealing with Toyota in March 2003. (Tr. at 148.) At the hearing, John Levine, a Yale representative, testified that he asked Craig Avery on July 3 and July 7, 2003 whether the rumors concerning Lilly and Toyota, which Avery allegedly denied, were true. (Tr. at 150–53.) In contrast, the Lilly executives stated that they had not been dishonest with Yale about their dealings with Toyota.[7] Clark,

---

**7.** Lilly also insists that Yale's argument that it had cause to terminate the agreement under Section 3.14 is not properly before the Court because Yale did not cite that section in the Notice of Termination sent to Lilly as required by § 47–25–1302(b), nor was it included in the complaint or amended complaint in this action. (Pre–Hr'g Br. Lilly Co. at 20 n. 5.) However, Yale is only claiming to have cause to terminate the agreement under § 47–25–1302(a) which defines "good cause" as "failure by a retailer to comply with requirements imposed upon the retailer by the retail agreement if such requirements are not different from those imposed on other retailers similarly situated in this state." Tenn.Code

president of Lilly, testified that he plainly told Yale in the meeting on July 21, 2003 that Lilly was considering an offer to become a Toyota dealer and that he would let them know of Lilly's final decision in several days. (Tr. at 79.) It was only after the meeting with Yale that Lilly's board of directors decided to proceed with the Toyota deal. (Tr. at 88.) Although the evidence does not necessarily favor one party over the other, Lilly need not prove that it is likely to unquestionably win on this argument if it can demonstrate a strong probability that it will suffer irreparable harm if the injunction is not issued. *United States v. Any and All Assets of Shane Co.*, 816 F.Supp. 389, 399 (M.D.N.C.1991) (stating that "the moving party's burden to show success on the merits is based on a sliding scale" and "if the moving party prevails on the balance of harms, it is enough that grave or serious questions are presented[ ] and [the moving party] need not show a likelihood of success").

■ In its closing brief, Yale argues that Lilly had "unclean hands" because of Lilly's "bad faith and outright deceit" which "help tip the balance of hardships, the merits and the equities even further in favor of Yale." (Yale's Closing Br. Opp'n Lilly's Mot. Prelim. Inj. at 11.) However, the doctrine of unclean hands "operates to deny equitable relief to a party who is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Monsanto Co. v. Trantham*, 156 F.Supp.2d 855, 871 (W.D.Tenn.2001); *see also Northeast Women's Center, Inc. v. McMonagle*, 868 F.2d 1342, 1354 (3d Cir. 1989) (stating the equitable doctrine is not a "matter of defense to the defendant" but is "concerned primarily with [the court's]

own integrity"). Yale's has not established any conduct on behalf of Lilly which amounts to fraud or deceit. Lilly's board of directors did not decide to represent Toyota until the end of July and after Clark plainly told Yale that he was considering the Toyota offer. (Tr. at 79, 88.) Thus, the Court's integrity would not be impugned if an injunction is issued. *See Northeast Women's Ctr.*, 868 F.2d at 1354.

*2. Irreparable harm to Lilly if an injunction is not issued.*

Lilly argues that if Yale is allowed to terminate the Memphis Agreement, it will suffer irreparable harm. Thomas Clark, President of Lilly, testified at the preliminary injunction hearing that Lilly would have to discharge 40% of its employees if only the Memphis dealership was ended. (Tr. at 94.) He also stated that Lilly has extensive maintenance contracts that require it to service customers under agreements at certain prices and that even if it can still obtain Yale parts after the contract is terminated, Lilly would be unable to service the contracts when the discounted price was unavailable. (Tr. at 90–91.) Therefore, Clark concludes that a large part of the customer base would be lost. (Tr. at 90–91.) As a result, Clark submits that Lilly's goodwill which has taken years to establish will be destroyed. (Tr. at 92.) Finally, even if Lilly obtained a favorable ruling at the end of trial, the employees who Lilly trained for years to be qualified as technicians on the equipment, after being discharged, could not simply be hired back. (Tr. at 95.) As Craig Avery, chief operating officer for Lilly, testified, "a lot of our technicians have been there 15, 20 years." (Tr. at 132.) Avery also stated that because Yale and Toyota products are

Ann. § 47–25–1302(a). Subsection (b) states that "notice is not required if the reason for termination, cancellation or nonrenewal is a violation under the provisions of subsection (a)." Tenn.Code Ann. § 47–25–1302(b).

made differently, the technicians trained on Yale products would not be able to repair Toyota products without extensive training. (Tr. at 133.) As the chief operating officer for Lilly, Avery noted that it had taken nine years to increase the revenues of the company from seven to twenty-two million dollars and if the Memphis agreement was terminated, Lilly could not calculate a specific amount of how much revenue would be lost. (Tr. at 134.)

Conversely, Yale submits that because Lilly's losses would be from lost sales and servicing of Yale products, money damages can compensate it if the termination of the contract is determined to be wrongful. (Yale's Prelim. Inj. Hr'g Br. at 15.) William Pfleger, director of dealer development for Yale, related that Lilly would not be negatively affected by terminating the dealer agreement in Memphis because Lilly had "picked up the lower half of Mississippi [from the Toyota relationship] … and [he] would expect they actually would perform at a higher level." (Tr. at 254.) Yale also highlighted the testimony of Clark stating that 100 employees worked in Memphis in July 2003 and that at the date of the hearing, the total increased to 140 as a result of gaining more territory under the Toyota agreement. (Tr. at 114–16.) Furthermore, Yale asserts that the testimony reflected that Lilly's lost profits from the sale of Yale products could be replaced by the sale of Toyota products since Lilly generated most of its revenue from service contracts. (Yale's Closing Br. Opp'n Lilly's Mot. Prelim. Inj. at 5.) However, Yale's argument is based on the premise that Lilly would be able to purchase Yale parts from other Yale dealers. This assumption lacks a foundation after Yale announced its policy disallowing the sale of Yale and Premier Parts to third parties for resale. Additionally, although Lilly could possibly be compensated with monetary damages for lost profits from the selling and servicing of Yale products, the revenue and profitability generated by employees in whom Lilly had invested could not be easily calculated or compensated with monetary relief. (Tr. at 95.) Therefore, based on that uncertainty of calculated damages, Lilly will likely suffer irreparable harm if the Court does not issue an injunction.

### 3. Harm to Yale that might result if the injunction were issued.

Yale claims that it will suffer harm due to loss of customer relationships and misappropriation of its trade secrets in Memphis and Nashville. (Yale's Prelim. Inj. Hr'g Br. at 20.) The Plaintiff is concerned that Lilly will continue to have access to highly confidential information about Yale's pricing and strategies for competing with other manufacturers which Lilly might use to benefit Toyota. At the preliminary injunction hearing, Donald Chance, president of Yale, stated that it would be very difficult for Yale to discuss among its dealers its strategies and finalize proposals while also having a dealer that represents competitors. (Tr. at 170–71.) Chance further asserts that an injunction would have a significant impact on the fleet program. For example, during conference calls with dealers and Lilly, open communications would be restricted due to dealers knowing a competitor was on the phone. (Tr. at 171.)

Lilly maintains that Yale will not suffer any material harm because it continues to earn money for Yale. As well, the Plaintiff has permitted other of its dealers to sell competing equipment without apparently suffering any harm. For example, Black Equipment Company, a Yale dealer in Indiana, had signed an agreement which contained Section 3.15. However, Chance acknowledged that Black promoted Clark and Lindie products, both competitors with

Yale in the lift truck industry. (Tr. at 185–86.) Black had been a Yale dealer since 1999 and was still selling Lindie equipment, a Yale competitor. (Tr. at 187.) Similarly, AR Williams became a Yale dealer two years ago and continued to market Clark and Daewoo equipment which compete with Yale products. (Tr. at 195.) There is no evidence before the Court that the Plaintiff is harmed by dealers such as Black and AR Williams dealing in two competing brands. Chance claims that AR Williams is only allowed to carry the other brands as part of a transition to becoming a Yale dealer. Although AR Williams and Yale have agreed to terminate their dealership agreement over several months, (Tr. at 196), Chance has not claimed that Yale has suffered any harm due to misappropriation of competitive pricing policies and strategies. Moreover, in its bidding process, Yale discloses the pricing of equipment and services to the proposed customer and as Chance admitted, there is no confidentially agreement protecting that information. (Tr. at 199–201.) As conceded by Plaintiff's representatives, there is nothing to prevent customers from taking Yale's quote, disclosing it to Toyota, and asking for a lower price. (Tr. at 201–02.) Furthermore, communications between Yale, Black, AR Williams, and the rest of the Yale dealers do not appear to be impaired. Therefore, the Court concludes that Yale would not be materially harmed if the Court issued a preliminary injunction.

### 4. Whether the public interest would be served by issuance of the injunction.

"The public interest may be declared in the form of a statute." 11A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 2948.4 (2d ed.1995). In *Vanadium Corp. of Am.*, 203 F.Supp. at 696, the court, in deciding whether to issue an in-

junction, stated the "record ... shows not only the plaintiff's interest for protection, but also the ever-present public interest to be on guard against violations of the antitrust statutes." Similarly, the Tennessee legislature has declared the public interest in § 47–25–1311 that a "retailer shall be entitled to injunctive relief against unlawful termination ...." Tenn.Code Ann. § 47–25–1311(b); *see also Power & Telephone Supply Co., Inc.*, 268 F.Supp.2d at 987 (stating that the court cannot conceive of a clearer statement of a "fundamental policy of Tennessee to protect ... retailers"). Because § 47–25–1311 explicitly reflects the public interest and requires a court to guard against violations of the statute, the public interest factor weighs in favor of the Lilly Company. *See Vanadium Corp. of Am.*, 203 F.Supp. at 696.

The Court finds that a preliminary injunction is appropriate due to Lilly's strong probability of suffering irreparable harm and strong likelihood of success against termination under Section 3.15 as well as the public interest favoring an injunction against unlawful termination of the agreement. In addition, Yale does not appear likely to suffer any irreparable harm if it is enjoined from terminating the Memphis agreement. Therefore, the Court GRANTS Defendant's application for a preliminary injunction.

### CONCLUSION

For the reasons stated above, Defendants' motions to strike Plaintiff's supplemental post hearing brief, Defendant's motion to consider post hearing facts, Defendant's motion to strike the Affidavit of William Pfleger, and Defendant's application for a preliminary injunction are GRANTED.